Antonio BALIOTIS and Ellen Baliotis, Individually and as Personal Representatives of the Estate of Jack Raymond Baliotis, Deceased

v.

Daniel McNEIL and Margaret McNeil and Frigidaire Co., Inc., et al.

Daniel McNEIL and Margaret McNeil

v.

WHITE CONSOLIDATED INDUSTRIES, INC.

v.

MOTOROLA, INC. and EAC Technologies Corp.

Civ. A. No. 92–CV–1140.

United States District Court, M.D. Pennsylvania.

Sept. 30, 1994.

Bruce Merrill, Newark, NJ, for plaintiff.

Timothy Foley, Scranton, PA, McNeils
Louis Bell, Philadelphia, PA, White Consol.,
for defendant.

## MEMORANDUM

VANASKIE, District Judge.

Defendant White Consolidated Industries, Inc. ("WCI") and Motorola, Inc. ("Motorola") have jointly moved for summary judgment based upon the "destruction" of the scene of a fire. The tenants and owners of the property severely damaged in the fire have alleged that the conflagration is attributable to a microwave oven manufactured by WCI and for which Motorola purportedly supplied components. In their motion, WCI and Motorola contended that the failure to preserve the fire scene until their representatives could conduct an inspection so impaired their ability to defend these consolidated cases that judgment should be entered in their favor against all claims of all other parties. In their supporting memorandum of law, WCI and Motorola requested, alternatively, that the fire "cause and origin" expert retained by the property owners' insurer be precluded from testifying. For the reasons set forth below, the sanctions requested by WCI and Motorola will not be imposed. Instead, the appropriate sanction for the spoliation of evidence that occurred here is an adverse inference instruction to the effect that physical evidence lost as a result of the destruction of the fire scene would have been unfavorable to the position asserted on behalf of the property owners.

## BACKGROUND

On August 21, 1990, a tragic fire swept through a home rented by Daniel and Margaret McNeil (the "McNeils") to Antonio and Ellen Baliotis (the "Baliotises"). The fire claimed the life of the Baliotises' three year old son.

The McNeil house was insured under a home owners policy issued to the McNeils by Liberty Mutual Insurance Company ("Liberty Mutual"). Upon receiving notice of the fire, Peter Alejnikov, a Liberty Mutual claims adjuster, retained Patrick J. McGinley Assoc., Inc. and Paul Zamrowski Associates to investigate the cause of the fire. Ray Zuck, a forensic electrical engineer, was assigned by Paul Zamrowski Associates to conduct the investigation.

On August 23, 1990, Alejnikov, Patrick McGinley and Zuck inspected the McNeil house. Also at the scene of the fire at that time was State Police Fire Marshal Walter Moschowsky.

It is undisputed that on August 23, 1990, McGinley was of the opinion that the fire had originated at countertop level in the northeast corner of the kitchen in the area of a microwave oven. (Joint Statement of Material Facts (Dkt.Entry # 56) ¶ 10.) Nor is it disputed that on August 23, 1990, Zuck expressed his opinion that the microwave oven and, in particular, an integrated circuit in the oven, caused the fire. (*Id.*, ¶ 11.)[1] Finally, there is no dispute that as of August 23, 1990, Zuck and Alejnikov knew that the microwave oven had been manufactured by WCI. (*Id.*, ¶ 12.)

Zuck and McGinley removed the microwave oven as well as a coffee maker and the wiring from a refrigerator (both appliances having also been identified as possible ignition sources) from the McNeil house on August 23, 1990. The allegedly defective microwave oven has not been destroyed, but has been preserved as evidence for this case.[2] McGinley and Zuck both took a number of photographs of the fire scene.

Fire Marshal Moschowsky concurred with McGinley's determination that the fire was electrical in nature, but concluded that the precise source was unclear. He identified seven "possible electrical ignition sources throughout the scene." (Exhibit "A" to the Brief in Support of Joint Motion for Summary Judgment (Dkt.Entry # 58).)[3] Fire Marshal Moschowsky concluded that the "most logical source" of the fire was inside the wall and over the sink in the kitchen. (*Id.*)[4] Fire Marshal Moschowsky took a number of photographs of the fire scene.

An inspection of the fire scene was also undertaken by Mr. Baliotis himself in the company of his brother-in-law, Steve Collora. A video tape, described as being two hours in length, was made during the course of this inspection. (Transcript of oral argument of September 12, 1994 (Dkt.Entry # 92) at p. 30.)

The Baliotises retained a fire "cause and origin" expert, Fred L. DiOrio. He inspected the fire scene on August 31, 1990. He, too, took a number of photographs of the fire scene. In a report dated September 14, 1990, DiOrio attributed the cause of the fire to improper electrical installations. In pertinent part, his report stated:

> It is my ... opinion that this fire originated in the kitchen area, at or near the wall above the sink. It is my understanding ... that there were appliances, including the microwave oven and automatic coffee maker which were plugged into the duplex receptacles installed in the wall above the kitchen sink. If any of these appliances

1. The existence of the allegedly defective integrated circuit is the subject of a second motion for summary judgment filed on behalf of WCI and Motorola. That motion will be disposed of by way of a separate Memorandum and Order.

2. *Motorola and WCI apparently concede that the coffee maker and refrigerator wiring have been preserved.*

3. Officer Moschowsky's report included the following description of the seven possible ignition sources:

> Point one (1) was the electric baseboard unit in the loft bedroom, which is now being eliminated as the chief source and carried as a secondary source. Point two (2) was the medicine cabinet in the loft powder room, which is being eliminated and carried as a secondary source. Point three (3) is the fluorescent light over the kitchen sink and is not considered as the chief source and carried secondary. Point four (4) is the shorted wire inside the kitchen wall over the sink. This wire is right in the "V" pattern and cannot be eliminated as the possible source. Point five (5) is the refrigerator and is being eliminated and carried secondary. Point six (6) is the microwave oven and from the burn pattern around and over it, it does not appear to be the source of the fire. Point seven (7) is the coffee maker and from the burn pattern on it, most of its damage is exterior and probably came from the fire attacking it.

4. At his deposition taken in this matter on November 19, 1992, Fire Marshall Moschowsky reiterated that it was his opinion that a "shorted" wire inside the kitchen wall over the sink was the most logical source for the fire and that the burn pattern was not consistent with a conclusion that the fire had been caused by the microwave oven. (Exhibit "G" to the McNeils' Response to the Summary Judgment Motion (Dkt.Entry # 60) at p. 48.)

experienced any kind of malfunction, this event would have normally tripped the safety mechanism contained in the circuit breaker to which the receptacle was wired. This would immediately cause the electricity to this receptacle to cease to flow.

It was evident from my examination of ... wires leading from the duplex receptacle on the left side of the sink in the kitchen, to the light fixture and duplex receptacle/light switch above and to the right of the sink, that the copper conductor was beaded on the ends and extremely brittle, indicating that it experienced an internal source of heat. (See photos # 13 and 16). Had circuit breaker # 5 not been taped in an "on" position, and allowed to function properly, this condition of the copper conductor could not have occurred.

By taping the circuit breakers in an 'on' position, the wire was allowed to overheat when the malfunction occurred, thereby causing a fire to occur in those combustible materials immediately surrounding it. It ... must be noted that the construction of this house lent itself to a very rapid fire spread due to the lack of fire resistant materials used in the construction of the building. In addition, the improper wiring which I observed throughout many areas of the house, particularly those connections made with masking tape, would have only added to the rapid ignition of a fire in this house, had the copper conductor become overheated. [Exhibit 1 to the Deposition of DiOrio.] [5]

DiOrio's conclusion, although apparently consistent with the Fire Marshal's, conflicts with the opinions of Liberty Mutual's experts. By report dated October 5, 1990, Patrick McGinley opined that "the specific ignition mechanism responsible for this fire was the Tappan microwave oven that was located at the point of origin of fire." (Exhibit "H" to the Joint Motion for Summary Judgment (Dkt.Entry # 57) at p. 3.) His conclusion was consistent with that expressed in the September 14, 1990 report of Mr. Zuck, which asserted:

In my professional opinion, the malfunction and arcing in the top of the microwave control printed circuit board is the cause and origin of the fire.

The refrigerator, coffee maker, bathroom lighting and wiring, baseboard heater controls and house electrical wiring, did not cause the fire.... [Exhibit "I" to the Joint Motion for Summary Judgment (Dkt.Entry # 57) at p. 6.]

Liberty Mutual paid the McNeils for their property loss as well as loss of rental income. Liberty Mutual also authorized demolition of the property, and this occurred in October of 1990.

By letter dated January 8, 1991, Liberty Mutual informed WCI that a Tappan microwave oven manufactured by WCI was responsible for this accidental fire. The January 8, 1991 letter asserted that Liberty Mutual would hold WCI responsible for the payments made by Liberty Mutual to the McNeils. The January 8, 1991 letter was the first notice that WCI had of this fire.

On August 20, 1992, the Baliotises, individually and as personal representatives of the Estate of Jack Raymond Baliotis, Deceased, filed this action, naming as defendants, *inter alia*, the McNeils and WCI. Prior to the commencement of the action by the Baliotises in this Court, the McNeils, on August 7, 1992, had commenced an action against WCI in the Court of Common Pleas of Pike County by causing the issuance of a writ of summons. WCI removed that action to this Court and it was then consolidated with the Baliotis case. The McNeils' Complaint was filed in this Court on October 2, 1992. WCI, on December 21, 1992, joined Motorola as a third-party defendant, alleging, *inter alia*, that Motorola was the manufacturer of the "printed circuit board" to which reference was made in the Zuck report.

The Joint Motion for Summary Judgment based upon the allegedly improper demolition of the fire scene was filed on October 21, 1993. The motion has been fully briefed and

---

**5.** It appears that Mr. DiOrio preserved the wiring that he observed inside the kitchen wall. DiOrio was deposed extensively on October 27, 1993. The transcript of his deposition was made a part of the record in this matter on September 16, 1994.

oral argument was conducted on September 12, 1994. This matter is ripe for disposition.

## DISCUSSION

■ Although raised in the context of a summary judgment motion, the arguments of WCI and Motorola address this Court's discretion to impose appropriate sanctions for spoliation of evidence. *See Donohoe v. American Isuzu Motors, Inc.,* 155 F.R.D. 515, 519 (M.D.Pa.1994). Authority to impose sanctions for the destruction of relevant evidence is recognized under state products liability law, *e.g., Lee v. Boyle–Midway Household Products, Inc.,* 792 F.Supp. 1001, 1005 (W.D.Pa.1992), and the inherent power of district courts to utilize sanctions in order to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991). As explained in *Uniguard Sec. Ins. Co. v. Lakewood Engineering & MFG Corp.,* 982 F.2d 363, 368 (9th Cir.1992), sanctions for loss of evidence is "part of a district court's inherent powers ... to make discovery and evidentiary rulings conducive to the conduct of a 'fair and orderly trial.' " [6]

■ Regardless of whether the issue is addressed under Pennsylvania substantive law or as a matter within the inherent power of a district court under federal evidentiary law, our Court of Appeals in *Schmid v. Milwaukee Electric Tool Corp.,* 13 F.3d 76 (3rd Cir.1994), established the analytical framework to address requests for sanctions based upon claimed destruction of evidence. Judge Stapleton, writing for the unanimous panel in *Schmid,* explained that a request for sanctions should be considered in the context of "(1) the degree of fault of the party who altered or destroyed the evidence; [and] (2)

the degree of prejudice suffered by the opposing party. . . ." *Id.* at 79. There is no rigid rule mandating a particular sanction upon a finding of improper destruction or loss of evidence. *See Donohoe,* 155 F.R.D. at 519. Instead, the matter is committed to the district court's discretion. *See Uniguard Sec. Ins. Co.,* 982 F.2d at 368–69. Our Court of Appeals has admonished that discretion should be exercised with a view to choosing " 'the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim.' " *Schmid,* 13 F.3d at 79. A sanction that has the "drastic" result of judgment being entered against the party who has lost or destroyed evidence, *id.,* must be regarded as a "last resort," to be imposed only "if no alternative remedy by way of a lesser, but equally efficient sanction is available." *Capellupo v. FMC Corp.,* 126 F.R.D. 545, 552 (D.Minn. 1989).

### A. *Fault*

■ The joint motion of WCI and Motorola is directed against not only the McNeils and their subrogor, Liberty Mutual, but also against the Baliotises. During oral argument, WCI candidly acknowledged that the Baliotises "played no part in the destruction of the [fire scene]." (Transcript of oral argument (Dkt.Entry # 92) at 10.) Accordingly, fault cannot be attributed to the Baliotises.

While acknowledging that a blameless party should not be sanctioned, WCI asserts that the Baliotises should not be beneficiaries of the destruction of the fire scene. WCI maintains that the "playing field can be leveled" by precluding the Baliotises from eliciting testimony from the Liberty Mutual "cause and origin" expert at time of trial. (Dkt.Entry # 92 at 14–15.) [7]

---

**6.** At oral argument, WCI indicated that it was requesting action pursuant to the Court's "inherent powers to regulate cases, control the admission and exclusion of evidence." (Transcript of oral argument (Dkt.Entry # 92) at 9.)

**7.** WCI's position as to whether any sanction is appropriate with respect to the Baliotises was not made clear at oral argument. At one point, WCI stated that the Baliotises "should not be sanctioned but nor should they be permitted to benefit." *Id.* at 10–11. At another point, WCI

asserted that "I cannot upon consideration of this matter credibly urge the Court to enter any sanction against the Baliotises. So I am not asking for that." *Id.* at 16. Motorola has agreed to a settlement with the Baliotises and a *Griffin*-type release has been executed. Thus, Motorola does not appear to have any liability exposure insofar as the Baliotises claim is concerned and there does not appear to be any basis for Motorola to seek a sanction against the Baliotises. In any event, the contention that the Baliotises

While there may be circumstances under which it is appropriate to impose a sanction adversely affecting a blameless party for a third-party's destruction of evidence, perhaps thereby creating a cause of action in favor of the blameless party against the spoliating party, the facts of this case do not warrant such a conclusion.[8] If the "fire scene" had been obliterated by some "act of God" or if there had been some other destruction of the evidence of the fire scene, such as a subsequent fire, for which the Baliotises were not responsible, WCI and Motorola would not be entitled to preclusion of otherwise relevant evidence. The fact that Liberty Mutual, after identifying WCI as a potentially responsible party, authorized destruction of the evidence should not yield a different result insofar as the Baliotises are concerned.[9]

In contrast to the Baliotises, the McNeils and their insurance carrier were in control of the fire scene. At the time the fire scene was demolished, Liberty Mutual had identified WCI as a potential subrogation target. Indeed, the McGinley and Zuck reports expressed the opinion that the WCI microwave oven was responsible for the fire.[10]

A "litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *Fire Insurance Exchange v. Zenith Radio Corp.*, 103 Nev. 648, 651, 747 P.2d 911, 914 (1987). That duty arises as soon as a potential claim is identified. As explained in *Hirsch:*

[A] duty to preserve evidence, independent from a court order to preserve evidence, arises where there is: (1) pending *or probable* litigation involving the defendants; (2) knowledge by the plaintiff of the existence or *likelihood of litigation;* (3) foreseeability of harm to the defendants, or in other words, discarding the evidence would be prejudicial to defendants; and (4) evidence relevant to the litigation. 628 A.2d at 1122 [emphasis added.]

■ Liberty Mutual contends that at the time it authorized destruction of the fire scene it had not decided to pursue a subrogation claim. Liberty Mutual's assertion that a decision to pursue a subrogation claim was not made until 1992, when it retained outside counsel, is belied by the letter it sent to WCI in January of 1991, asserting, without equivocation, that WCI was responsible for this fire. More importantly, however, the knowledge of a *potential* subrogation claim is deemed sufficient to impose a duty to preserve evidence. *See Fire Insurance Exchange* 103 Nev. at 651, 747 P.2d at 914. Accordingly, Liberty Mutual owed a duty to preserve evidence relevant to the origin and cause of this fire as soon as it identified a potentially responsible party.

■ "The scope of the duty to preserve evidence is not boundless." *Hirsch,* 628 A.2d at 1122. At a minimum, however, an opportunity for inspection should be afforded a

---

should be precluded from presenting testimony of the Liberty Mutual "cause and origin" expert, Mr. McGinley, will be addressed in the text.

8. In their Reply Brief to the Baliotises' letter brief, WCI and Motorola assert that the Baliotises *"presumably"* may seek redress against the McNeils and Liberty Mutual ... for any negligent or intentional interference with their prospective economic advantage" in the event that sanctions are imposed resulting in a judgment against the Baliotises. No case has been cited in support of the proposition that Pennsylvania recognizes an independent cause of action for damages for spoliation of evidence. In this regard, there appears to be a split of authority on this issue. *See Hirsch v. General Motors Corp.*, 266 N.J.Super. 222, 628 A.2d 1108, 1114 (1993).

9. There is no contention in this case that McGinley played any role in the decision to demolish the fire scene or that he suggested that destruction of the evidence would strengthen the case

against WCI and Motorola. Thus, there is no basis for imposing a sanction that is personal to Mr. McGinley.

10. For purposes of this argument, it is appropriate to consider only the actions of Liberty Mutual, and not those of the McNeils. In this regard, it appears undisputed that the subrogation claim filed by the McNeils is really being prosecuted by Liberty Mutual, which is seeking recovery of the amount it paid under the home owners policy—$84,100. It also appears undisputed that Liberty Mutual has assumed the defense of the Baliotises claims against the McNeils. There is no indication that Liberty Mutual suggested to the McNeils that the fire scene be preserved until potential subrogation claim defendants or other potential defendants to claims asserted on behalf of the Baliotises had an opportunity to inspect the premises.

potentially responsible party before relevant evidence is destroyed. *Id.* at 1123.

Liberty Mutual maintains that it did preserve the relevant evidence, *i.e.,* the microwave oven, coffee maker, and refrigerator wiring. Also available to WCI and Motorola is wiring from inside the kitchen wall retrieved by Mr. DiOrio. Liberty Mutual also points out that a number of photographs and a two hour video tape of the fire scene are available to WCI and Motorola. While such evidence may serve to ameliorate the prejudice to WCI and Motorola, Liberty Mutual cannot refute the assertion that demolition of the fire scene resulted in destruction of otherwise relevant evidence.

█ Contrary to Liberty Mutual's assertion, a finding of "bad faith" or "evil motive" is not a prerequisite to imposition of sanctions for destruction of evidence. *See, e.g., Uniguard Sec. Inc. Co.,* 982 F.2d at 369; *Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 219 (1st Cir.1982). Since Liberty Mutual authorized the destruction of indisputably relevant evidence, it and its insureds, the McNeils, are subject to sanctions.

█ The motive for the destruction of evidence is, of course, relevant to determining what sanctions, if any, should be imposed. *Schmid* makes clear that it is "the degree of fault" that is at issue. Evidence warranting a finding of bad faith may support the drastic sanction of preclusion of evidence that could result in the entry of judgment against the spoliating party. *See, e.g., Lewis v. Darce Towing Co.,* 94 F.R.D. 262, 269 (W.D.La. 1982).

█ In this case, the evidence does not support a determination that Liberty Mutual acted in bad faith. Although it had identified WCI as a potential subrogation target at the time it authorized demolition of the fire scene, no evidence was presented that a decision had been made by then to pursue a subrogation claim. Nor was any evidence presented that Liberty Mutual sought to destroy the fire scene in order to divert liability from its insureds, the McNeils, to WCI. In addition to the absence of evidence of bad faith, there is evidence that the fire scene

was a safety hazard that should have been destroyed as soon as reasonably possible. In this regard, no party has contended that the fire scene should have been preserved indefinitely. The record presented to this Court thus does not permit the conclusion that Liberty Mutual acted in bad faith.

### B. *Prejudice*

█ It is clear, as Motorola and WCI assert, that a manufacturer of a product that is allegedly responsible for causing a fire is prejudiced if it cannot have its own cause and origin expert inspect a fire scene for other potential causes. *Schmid,* 13 F.3d at 80 ("defendant will want as much evidence as possible relevant to the issue of causation"). It goes too far, however, to assert that demolition of the fire scene "rendered it *impossible* for [WCI] and Motorola to defend themselves." (Brief in Support of Joint Motion for Summary Judgment, p. 9; emphasis added.)

█ In contrast to those case where the *allegedly defective product* as well as the fire scene were destroyed, *e.g. Uniguard Sec. Ins. Co., supra; Fire Insurance Exchange v. Zenith Radio Corp., supra,* the microwave oven as well as other items identified as potential causes of the fire have been preserved in this case. WCI and Motorola have the ability to defend their respective products by having experts examine the microwave oven and refute Liberty Mutual's assertions. Moreover, wiring from inside the kitchen wall, identified by other experts as the point of ignition, is available. Also mitigating the prejudice is the existence of scores of photographs and a lengthy video tape of the fire scene. Furthermore, a cause and origin expert retained by the Baliotises has submitted a report in which he concludes that the fire started inside the wall of the kitchen, and the State Fire Marshal identified that area as the logical source of the fire. Indeed, because of burn patterns, he excluded the microwave oven as the potential source of ignition.

At oral argument, Motorola acknowledged that the evidence supplied by the Baliotises' cause and origin expert "is very supportive of

a cause other than the microwave." (Transcript of oral argument (Dkt.Entry # 92) at 23.) WCI conceded that it has retained a cause and origin expert who has available to him all of the evidence referenced above. (*Id.* at 38.) No affidavit has been presented in this case that either WCI or Motorola will be unable to present expert witness evidence on the cause and origin of this fire because of the demolition of the fire scene.[11] Accordingly, a defense to this action has not been rendered impossible by the demolition of the fire scene. Thus, neither summary judgment nor preclusion of testimony from McGinley appears appropriate.

Our Court of Appeals has indicated that where there is no bad faith on the part of the spoliating party and the prejudice is not severe, a sanction of witness preclusion or entry of judgment is unwarranted. 13 F.3d at 81. The Third Circuit specifically rejected a blanket preclusion rule based on the proposition that an expert witness "has an affirmative duty not to conduct an investigation without affording all potential defendants an opportunity to have an expert present." *Id.* The Court explained:

> An across-the-board rule that would require an identification of all potential defendants at this nascent stage of the potential controversy and an invitation to each of them to attend an exploratory investigations would be inefficient, if not all together unworkable. Many accident investigation do not lead to litigation and many narrow the field of potential defendants. There are still more situations in which the resources necessary to assemble the experts of potential defendants would be invested with no significant return on the investment. On the other hand, in cases like this one, the attendant delay would pose a significant risk of prejudice to the plaintiff. *Id.*

This analysis applies with equal force in the context of a fire scene. Requiring an insurer or property owner to maintain the scene of a fire until all potential defendants have been notified and afforded an opportunity to conduct independent inspections would, at minimum, be inefficient and wasteful. There is also the potential for harm to others by maintaining a safety hazard. Clearly, the blanket rule urged by WCI and Motorola is inconsistent with the approach required in *Schmid.*[12]

A lesser sanction of a "spoliation inference," however, is warranted. Defense of this case has been rendered more difficult by the failure to have an opportunity to inspect the scene. WCI and Motorola note that Liberty Mutual's experts failed to photograph all relevant evidence and that the photographs are often of poor quality. They also point out that Baliotises' cause and origin expert did not trace all of the wiring throughout the home and was not an expert in electrical matters. Under these circumstances, an inference adverse to Liberty Mutual and its insureds appears appropriate.

An instruction to the jury that it may consider that the lost evidence would be unfavorable to the McNeils is consistent with the evidentiary rationale underlying the "spoliation inference," which is "the common sense observation that a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy [it] is more likely to have been threatened by [that evidence] than is a party in the same position who does not destroy the [evidence]." *Nation–Wide Check Corp.,* 692 F.2d at 218. Permitting the jury to draw such an inference also furthers the prophylactic and punitive purposes of the "spoliation inference." *Id.* Property insurers who permit the destruction of a fire scene after identifying subrogation targets should suffer some sanction where, as here, it is

---

**11.** By way of contrast, in cases where sanctions were imposed that had the effect of entering judgment against the spoliating party, the record included affidavits from expert witnesses to the effect that in order to determine the cause of a fire an inspection of the fire scene or other destroyed evidence was "necessary," *Uniguard Sec. Ins.,* 982 F.2d at 365, or "absolutely critical." *Travelers Ins. Co. v. Knight Electric Co.,*

1992 WL 398201 at *1 (Ohio App. 5th Cir.Dist. 1992).

**12.** At oral argument, WCI conceded that it could not cite any case which held that the demolition of a fire scene, in and of itself, warranted preclusion of testimony or entry of judgment against the spoliating party. (Dkt.Entry # 92 at 36–37.)

clear that relevant evidence has been lost.[13] Knowledge that sanctions may be imposed for loss of relevant evidence attending destruction of a fire scene, resulting in prejudice to subrogation targets, may induce insurers or property owners to provide notice to those targets and an opportunity to inspect.[14]

## CONCLUSION

Having considered the degree of fault of Liberty Mutual, the degree of prejudice suffered by WCI and Motorola, and the least onerous sanction corresponding to the degree of fault and prejudice suffered, the Court concludes that an "adverse inference" instruction is appropriate. Accordingly, to the extent that WCI and Motorola seek summary judgment or the preclusion of Mr. McGinley from testifying, their motion filed on October 21, 1993 will be denied.

---

13. Consideration of the appropriate sanction in this case is complicated by the fact that this is not a simple subrogation case. The rights of the Baliotises must be taken into account. Imposing as a sanction a rebuttable presumption that the microwave oven was not the cause of the fire would appear to adversely affect the Baliotises. In this regard, it appears that the Baliotises are contending that there was a malfunction in the microwave that lead to overheating of the copper wires because a circuit breaker had been taped in the "on" position. Accordingly, the rebuttable presumption sanction imposed in *Welsh v. United States*, 844 F.2d 1239, 1248 (6th Cir.1988), will not be imposed as a sanction at this time. The parties, however, remain free to contend that based upon the evidence presented at trial WCI and Motorola are entitled to such a presumption.

14. In this regard, it is undisputed that as early as August 23, 1990, WCI was identified as a potential subrogation target (and likely defendant or third party defendant in an action arising out of the death of the Baliotises' three year old son). The scene of the fire was not demolished until October. There was thus ample time within which to provide notice and an opportunity for inspection.