David J.T. MILLER, Appellant,

v.

Linda J. LANKOW, et al., Respondents,

DCI, Inc., Defendant,

Donnelly Brothers, Respondent,

Total Service Company, Respondent,

and

Linda J. Lankow, et. al., Third–Party Plaintiffs, Respondents,

v.

Burnet Realty, Inc., d/b/a Coldwell Banker Burnet, et al., Third–Party Defendants, Respondents.

No. A09–0244.

Supreme Court of Minnesota.

Aug. 3, 2011.

Patrick W. Michenfelder, Frederick M. Young, Gries & Lenhardt, P.L.L.P., St. Michael, MN, for appellant.

Robert P. Christensen, Robert P. Christensen, P.A., St. Louis Park, MN; and Scott Wilson, Shorewood, MN, for respondents Linda J. Lankow, et al.

Timothy W. Waldeck, Waldeck & Lind, P.A., Minneapolis, MN, for respondent Donnelly Brothers.

Paul E.D. Darsow, Jonathan M. Zentner, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, MN, for respondent Total Service Company.

William L. Davidson, Timothy J. O'Connor, Lind, Jensen, Sullivan & Peterson, P.A., Minneapolis, MN, for respondents Burnet Realty, Inc., et al.

Sharon L. Van Dyck, Van Dyck Law Firm PLLC, St. Louis Park, MN; and Anne E. Workman, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, for amicus curiae Minnesota Association for Justice.

## OPINION

ANDERSON, Paul H., Justice.

Appellant David Miller purchased a home owned by respondents Linda Lankow and Jim Betz, which home had been extensively remediated because of moisture intrusion damage. Respondents Donnelly Brothers and Total Service Company and defendant Diversified Contractors, Inc., did the remediation work on the home. After moving into the home, Miller discovered additional moisture intrusion damage. More than 18 months after notifying the respondents and the defendant of the damage, Miller began to repair the home. Three months later, Miller commenced this action against respondents and defendant to recover damages. The Wright County District Court excluded Miller's expert witness evidence as a sanction for the spoliation of evidence that resulted from Miller starting to make repairs to his home. The court then granted respondents' summary judgment motion on the basis that Miller could not make a prima facie case without the expert evidence. The court of appeals affirmed. We reverse.

Respondent Linda J. Lankow built a home in St. Michael, Minnesota, in 1992.

Lankow's husband, respondent Jim Betz, moved into the home in 1999. In 2001 or 2002, Lankow discovered a problem with the stucco on the south wall of the home's garage. The stucco was lifting away from the wall, a problem that Lankow attributed to moisture intrusion. After discovering this problem, Lankow asked the original contractor to fix the wall.

In 2003, Lankow offered the home for sale, and, shortly after doing so, she entered into a purchase agreement. A home inspection conducted under the terms of the purchase agreement revealed fungal growth in a basement wall. When the potential buyers discovered this defect, they cancelled the purchase agreement. Lankow then hired Industrial Hygiene Services Corporation (IHSC) to test the home's interior drywall for fungal problems. IHSC's tests indicated that one area of the basement showed evidence of elevated moisture in the wall cavity. As a result of this report, Lankow hired three contractors to conduct repairs on the home's basement wall. Defendant Diversified Contractors, Inc. (DCI), was responsible for applying anti-fungal paint to the affected wood. Respondent Total Service Company (TSC) was responsible for investigating the extent of the moisture damage and repairing the home's wooden structures. Finally, because the repair of the internal structure would involve work on the outside walls, respondent Donnelly Brothers was hired to replace the stucco removed as a result of the repairs.

As work proceeded, it became clear that the moisture intrusion damage was more extensive than previously thought. As a result, Lankow asked IHSC to conduct further testing. IHSC returned to conduct this testing on July 28, 2003, and three days later submitted the results of its tests to Lankow. In its report, IHSC detailed several areas of the home that had

heightened moisture levels. Based on IHSC's supplemental report, Lankow asked TSC to expand the scope of its investigation and repair. TSC agreed to investigate the area surrounding the moisture damaged areas until it was "comfortable" that it had identified and repaired the damage in those locations. TSC did identify and repair the damage, after which Donnelly Brothers repaired the stucco. Lankow also hired a landscape contractor, Bob Schroeder, to landscape the lawn in order to allow water to flow away from the home.

After the foregoing repairs were completed, Lankow again put her home on the market. In February 2004, she listed the home with Mark Geier, a real estate agent affiliated with Burnet Realty, Inc. On March 23, 2004, Lankow entered into a purchase agreement with appellant David Miller. At some point in the negotiations, Miller attended a showing of the home. At this showing, Miller learned about the moisture damage and Lankow's remediation work. Lankow also attached a disclosure statement to the purchase agreement that read as follows: "Seller became aware of a moisture intrusion/mold issue in spring of 2003. The affected areas were remediated by licensed professional contractors and engineers." The disclosure also stated the following:

> If you have a concern about water intrusion or the resulting mold/mildew/fungi growth, you may want to consider having the property inspected for moisture problems before entering into a purchase agreement or as a condition of your purchase agreement.

Attached to the disclosure statement were the IHSC reports, and invoices from DCI, TSC, Donnelly Brothers, and Bob Schroeder. Miller testified that he did not examine these documents until well after the closing. Miller also testified that his real estate agent at Burnet Realty, told him that Miller could have an inspection performed of the home at his own expense. Miller declined to conduct an independent inspection, saying that, because the home was repaired by professional contractors, he did not wish to spend extra money for the inspection. The closing of the home sale took place on May 21, 2004.

In 2005, Miller decided to sell the home, and entered into a purchase agreement with a prospective buyer. Along with the purchase agreement, Miller provided a statement that disclosed that the home's previous owner had experienced moisture problems. After receiving this information, the prospective buyer decided to investigate further, and requested a partial moisture inspection and report from Private Eye, Inc., (Private Eye) a home inspection firm. Private Eye's report indicated that the home still had significant moisture intrusion problems. After receiving this report, the prospective buyer decided not to purchase the home. Miller then contacted a friend who worked at a construction firm. Miller's friend came to the home and cut a hole in an exterior wall near the front entrance. When Miller examined the opening, he saw moisture on the inside of the wall and noticed that a board installed by TSC during Lankow's repairs was soft to the touch. Miller then had Private Eye complete the partial report that the prospective buyer had commissioned. The completed report was dated October 7, 2005.

On or about September 25, 2005, and before receiving Private Eye's completed report, Miller notified Donnelly, TSC, and DCI of his discovery of renewed moisture intrusion problems. On September 30, Donnelly and TSC representatives visited the home. During this visit, Miller showed the Donnelly and TSC representatives the hole in the wall, and they agreed that

there was moisture in the wall. The contractors told Miller that they had only done limited repairs for Lankow, but they agreed that the area behind the hole was an area that they had repaired. Miller told the contractors that it would be necessary to have the problem fixed immediately because he did not want his children living with him in a mold-infested home. Miller asked the contractors what they could do for him. Mark Donnelly of Donnelly Brothers responded that he could give Miller a "fairly good price" for repairs, but no other suggestions or offers were made.

A few days after meeting with Miller, Donnelly and TSC met with Lankow and Betz to discuss the possibility of Miller bringing a "lawsuit" and the potential claims that he might assert against each of them. In his deposition, Jeff Agness of TSC stated:

> The purpose of the meeting was to make us aware that there may be a *lawsuit* on this, and for the people that were involved in that to, you know, kind of take a look at what does that mean, why are we being sued, what are the issues here.

(Emphasis added.)

After meeting with the contractors, Miller hired attorney Michael G. Halvorson. On December 27, 2005, Halvorson sent letters to DCI, Donnelly Brothers, TCS, Lankow, and Betz. The contractors all received the same letter, in which Halvorson stated that he represented Miller in connection with construction problems Miller was having, and notified the contractors of potential construction defects in violation of Minn.Stat. ch. 327A (2008). Halvorson also stated that an inspection had revealed several instances of water infiltration and mold, and that the inspection report "discussed several items of work which was done inappropriately." Finally, the letter to each contractor contained the following paragraph:

> It is my hope that between your companies, the previous owner, and my client, we will be able to resolve this issue amicably and without much legal cost. As such, please contact me at your convenience if you wish to inspect the property and discuss possible resolutions. However, if I do not hear from you by January 9, 2006, I will presume that you do not wish to work on a resolution and I will put the matter into suit.

Halvorson sent a substantially similar letter to Lankow and Betz.

Betz, who is a lawyer, responded to Halvorson on January 5, 2006. Betz stated that he represented Lankow, reminded Halvorson that Miller had declined an opportunity to inspect the home at the time of purchase, and inquired as to the basis on which Miller intended to assert a claim. Donnelly responded to Halvorson's letter by inspecting the home for a second time on March 10, 2006. TSC did not attempt to inspect the home at any time after its initial meeting with Miller. Lankow and Betz did not attempt to inspect the home until July 2008. There is no evidence on the record that DCI ever attempted a follow-up inspection of the home.

More than one year later, on March 15, 2007, Patrick W. Michenfelder, Miller's new attorney, sent letters to DCI, TSC, Donnelly, Lankow, and Betz, notifying them that Miller intended to begin remedial work on the home. Michenfelder stated in the letter that any recipient wishing to further inspect the home should contact him immediately and that corrective work would begin on March 22, 2007. Michenfelder concluded the letter by saying:

> In view of the previous notice to you and opportunity to inspect, Mr. Miller does not have any obligation to permit any further inspection before completing

the repair work. Accordingly, this letter is sent merely as a courtesy, and is not indicative or to be construed as any admission of any obligation to provide further notice or further opportunity to inspect prior to completing the remedial work that is necessary.

On March 23, 2007, Donnelly visited the home for a third time and stated that he found that all of the stucco had been removed. Miller subsequently testified that he had hired another contractor, J. Brothers' Home Improvements, to remove the stucco, and J. Brothers had done so during February or March 2007. The contract Miller signed with J. Brothers indicates that $10,000 was due on signing and that this amount was paid on February 2, 2007; another $10,000 due when the repair work started and this amount was paid on March 9, 2007. An additional $20,000 was due when the stucco was removed and this amount was paid on March 15, 2007. Thus, there is conclusive evidence that the remediation work done by J. Brothers was well underway before Michenfelder sent the March 15 letter. Nothing in the record suggests any remediation other than removal of the stucco had been done by March 22, 2007.[1]

Miller commenced this action on April 27, 2007. His complaint contained nine counts: (1) deceptive practices and violation of certain provisions of the Minnesota Consumer Fraud Act, specifically Minn. Stat. §§ 325F.69–.70 (2010); (2) fraud; (3) misrepresentation; (4) estoppel; (5) breach of contract; (6) unjust enrichment; (7) breach of warranty; (8) violation of the "disclosure statute," Minn.Stat. §§ 513.52–.60 (2010); and (9) negligence. The first eight counts applied to Lankow and Betz only. The ninth count, negligence, applied to all the defendants. Lankow and Betz subsequently commenced a third-party action against Mark Geier and Burnet Realty alleging that any challenged representations were made at the direction of Geier and Burnet Realty, and that any liability on the part of Lankow and Betz was the result of violations of Geier's and Burnet Realty's fiduciary duties. Several cross-claims were also filed, but those cross-claims are not relevant to this appeal. In response to discovery requests made by Lankow, Miller identified four experts, including Miller himself, on whom he intended to rely at trial. Miller stated that all three experts were expected to rely on their observations of the home. The record indicates that one of these experts, Charles Johnson, had an opportunity to inspect the home when he cut a hole in the wall to inspect the underlying boards.

TSC, Donnelly Brothers, Lankow, and Betz filed motions for summary judgment in September 2008. DCI did not file a motion for summary judgment and settled with Miller in October 2008. Importantly for this appeal, the respondents argued in their summary judgment motions that Miller's expert reports relating to moisture intrusion and the extent of mold should be excluded on the grounds of spoliation of evidence. More particularly, they argued that Miller had spoliated evidence by removing the stucco without giving the defendants an opportunity to independently inspect the home. Lankow and Betz also argued that Miller's disclosure claim was time-barred.

---

1. The court of appeals stated that "by March 23, 2007, when a representative from Donnelly visited the home, the entire exterior of the home, including the stucco and the underlying plywood, had already been removed, and only insulation remained in the wall cavities."

*Miller v. Lankow,* 776 N.W.2d 731, 735 (Minn. App.2009). However, the district court made no such finding, and the record does not reflect that anything other than the stucco had been removed by this date.

The district court imposed sanctions for spoliation of evidence and granted all respondents' and third-party defendant's motions for summary judgment. The court, noted that a "district court can sanction a party who destroys evidence (even inadvertently)," and that "[t]he party can avoid sanctions if the opposing party had reasonable notice of the claim." The court went on to state that "the [d]efendants did not have sufficient notice that the evidence would be destroyed or that a claim was being sought against them. Further, the notice failed to give the [d]efendants sufficient time to correct the defects or do a detailed inspection to prepare for litigation." Because the respondents and third-party defendant did not have an opportunity to independently inspect the evidence prior to its destruction, the court found that they had suffered "extremely significant" prejudice. The court then sanctioned Miller by excluding all of his expert reports and testimony relating to moisture intrusion and the extent of the mold. The court concluded that "there is no other evidence as to the cause or origin of the moisture intrusion and the extent of the mold," and accordingly granted summary judgment and dismissed all claims for lack of evidence. Finally, the court also appears to have concluded that Miller's disclosure statute claim under Minn.Stat. § 513.55 was time-barred by Minn.Stat. § 513.57.

A divided court of appeals affirmed the district court. *Miller v. Lankow*, 776 N.W.2d 731, 741 (Minn.App.2009). The majority held that (1) the district court did not "commit clear error" by imposing spoliation sanctions against Miller, and (2) the district court did not err in granting summary judgment to the respondents under Minn.Stat. § 513.57. *Id.* On the first issue, the court of appeals majority addressed the question of what notice was necessary to avoid sanctions for spoliation. *Id.* at 736. The court analyzed *Hoffman v. Ford Motor Company*, 587 N.W.2d 66 (Minn. App.1998), and concluded that "a party must provide actual notice of the nature and timing of any action that could lead to destruction of evidence and afford a reasonable amount of time from the date of the notice to inspect and preserve evidence." *Miller*, 776 N.W.2d at 738 (citing *Hoffman*, 587 N.W.2d at 70). The court concluded that the district court did not err by concluding that notice was insufficient to avoid spoliation sanctions. *Id.* at 739. The court also held that the district court did not abuse its discretion in excluding Miller's expert evidence as a sanction for the spoliation. *Id.* at 740. On the second issue, the court of appeals majority held that the district court did not err in relying on the time-bar statute, Minn.Stat. § 513.57, subd. 2, because Minn.Stat. § 513.57 was not the primary basis for the district court's grant of summary judgment. *Miller*, 776 N.W.2d at 740–41.

The court of appeals dissent stated that, by requiring Miller to inform the defendants not just of his potential claim but also his plan to remediate, the majority had added an additional component to the existing law. *Id.* at 741 (Klaphake, J., dissenting). The dissent noted that by 2007 the respondents had repeatedly received notice of the potential claim and still had taken no action to correct the construction defects or to safeguard evidence. *Id.* at 743. The dissent also stated that the respondents had failed to show prejudice resulting from the unavailability of the evidence. *Id.* at 743–44. The dissent concluded that the respondents had failed to respond to Miller simply because they may have had no incentive to do so, and stated that "their dilatory tactics should not give them a legitimate spoliation claim." *Id.* at 743.

We granted Miller's petition for review on the issue of whether a party, in order to avoid sanctions for spoliation of evidence, need only give notice of a breach or claim, or must also give notice of the nature and timing of any action that could lead to the destruction of the evidence. Miller also argues that the court of appeals erred in affirming the district court's grant of summary judgment on the basis of Minn.Stat. § 513.57.

## I.

■ We review a district court's decision to impose spoliation sanctions for abuse of discretion. *Patton v. Newmar Corp.*, 538 N.W.2d 116, 119 (Minn.1995). A party challenging the district court's choice of a sanction has the difficult burden of convincing an appellate court that the district court abused its discretion. *Id.* A district court abuses its discretion when it bases its conclusions on an erroneous view of the law. *State v. Askland*, 784 N.W.2d 60, 62 (Minn.2010); *see also State v. Storkamp*, 656 N.W.2d 539, 541 (Minn. 2003).

Miller argues that, on appeal, we must first conclude that the district court had the authority to impose sanctions in this case before considering whether the court abused its discretion when it selected the particular sanction at issue. Miller's argument is imprecise and not well developed, but he cites the following language from a court of appeals opinion to support his position: "On review, an appellate court considers whether the district court is authorized to impose a sanction for spoliation of evidence and, if so, whether it abused its

discretion by imposing such a sanction." *Foust v. McFarland*, 698 N.W.2d 24, 29 (Minn.App.2005) (citing *Wajda v. Kingsbury*, 652 N.W.2d 856, 860 (Minn.App. 2002), *rev. denied* (Minn. Nov. 19, 2002)) *rev. denied* (Minn. Aug. 16, 2005). It appears that Miller is arguing that *Foust* and *Wajda* establish a preliminary step that must be satisfied before the imposition of a sanction is reviewed under the abuse of discretion standard. More specifically, Miller argues that "the reviewing court first examines whether the district court was authorized to impose a spoliation sanction in the first place." To the extent that Miller is arguing that the abuse of discretion standard does not apply to a district court's determination on its authority to sanction, his argument is inconsistent with our case law. We established in *Patton*, 538 N.W.2d at 119, and clarify here that the correct standard of review of a district court's imposition of sanctions for spoliation of evidence is abuse of discretion.

## II.

■ We have said that the spoliation of evidence is the "failure to preserve property for another's use as evidence in pending or future litigation." *Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc.*, 456 N.W.2d 434, 436 (Minn. 1990) (quoting *County of Solano v. Delancy*, 264 Cal.Rptr. 721, 724 n. 4 (Cal.Ct.App. 1989)). Further, we have recognized that, regardless of whether a party acted in good or bad faith, "the affirmative destruction of evidence has not been condoned." *Patton*, 538 N.W.2d at 119. The duty to preserve evidence [2] exists not only after

---

**2.** Though we have never referred to a "duty to preserve evidence" in the civil context, we imposed in *Patton* an obligation to preserve evidence necessary for litigation. 538 N.W.2d at 119. Other courts have referred to the obligation to preserve evidence as a

"duty" in the context of discovery sanctions. *See Trevino v. Ortega*, 969 S.W.2d 950, 955 (Tex.1998) (Baker, J., concurring) ("Other jurisdictions have held that there is also a common law duty to preserve evidence."); *Banks ex rel. Banks v. Sunrise Hosp.*, 120 Nev. 822,

the formal commencement of litigation, but whenever a party knows or should know that litigation is reasonably foreseeable. *See id.* at 118–19. Breach of the duty to preserve evidence once such a duty arises may be sanctioned, under a court's inherent authority, as spoliation. *See id.* at 118. Here, we specifically reaffirm our rule that custodial parties have a duty to preserve relevant evidence for use in litigation. *Id.* at 116. We also reaffirm our previously stated rule that, even when a breach of the duty to preserve evidence is not done in bad faith, the district court must attempt to remedy any prejudice that occurs as a result of the destruction of the evidence. *Id.*

■ But a custodial party's duty to preserve evidence is not boundless. Several jurisdictions have recognized that, under limited circumstances, a party's destruction of evidence may be excused. *See, e.g., Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 458 (2d Cir. 2007) (holding that, when the custodial party offered an opportunity to inspect evidence and the opportunity was rejected, the district court abused its discretion when it imposed sanctions); *Baliotis v. McNeil,* 870 F.Supp. 1285 (M.D.Pa.1994) (noting that the scope of the duty to preserve evidence is not unlimited). A rule that too broadly forbids a custodial party from making repairs or remediating damage when such repair or remediation is necessary may be both unfair and impractical. *See Am. Family Mut. Ins. Co. v. Golke,* 319 Wis.2d 397, 768 N.W.2d 729, 737–38 (2009) (holding that a custodial party with a legitimate need to destroy evidence may do so after giving reasonable

notice to the noncustodial party); *see also* Jamie S. Gorelick et al., *Destruction of Evidence* § 1.14 (2010), *available at* Westlaw DSTEVID. In light of this unfairness, we conclude that the duty to preserve evidence must be tempered by allowing custodial parties to dispose of or remediate evidence when the situation reasonably requires it. *Accord Hirsch v. Gen. Motors Corp.,* 266 N.J.Super. 222, 628 A.2d 1108, 1122 (1993) (holding "[t]he scope of the duty to preserve evidence is not boundless. A 'potential spoliator need do only what is reasonable under the circumstances.' " (citation omitted)).

We believe that it may be particularly important to allow remediation in cases such as the one before us. Miller, the custodial party, is a homeowner and the evidence in his possession is the home in which he lives. Remediation of the moisture intrusion problem in the home may be necessary, even essential, to address immediate health concerns. Here, Miller told the respondent contractors at the September 2005 meeting that he was concerned about the health implications not only for himself but for his children when living in a home with moisture intrusion and mold problems. Miller asserts that under such circumstances, it would be unfair to force him to make the unpleasant and perhaps dangerous choice between preserving evidence for a potential lawsuit—by living in a mold-infested home— or remediating the mold infestation at the risk that any action to recover damages will be fatally compromised for spoliation of evidence. We agree that a party like Miller should not be forced to face such a dilemma. Accordingly, we conclude that a party with a legitimate need to destroy

---

102 P.3d 52, 58 (2004) ("When a potential for litigation exists, 'the litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.' " (citation omitted)). Our use of the word

"duty" is not meant to imply a general duty in tort. *Cf. Federated Mut. Ins. Co.,* 456 N.W.2d at 436–37 (declining to adopt a tort for spoliation of evidence).

evidence may, under certain limited circumstances, do so. We outline these limited circumstances below.

■ We first address what a custodial party must do before destroying any relevant evidence. A review of decisions from courts in several jurisdictions indicates that a "loose consensus" has developed that a custodial party may destroy relevant evidence after he discharges his duty to preserve evidence by "giving the other side notice of a potential claim and a full and fair opportunity to inspect relevant evidence." *Golke,* 768 N.W.2d at 737; *see, e.g., N. Assurance Co. v. Ware,* 145 F.R.D. 281, 284 (D.Me.1993) (noting that reasonable notice to likely parties might be sufficient to avoid sanctions for spoliation).[3] In the past, our court of appeals generally followed the similar principle that a party satisfies his duty to preserve evidence by giving the other party sufficient notice prior to destruction of the evidence.[4] Based on the foregoing case law, we conclude that a custodial party with a legitimate need to destroy evidence may be absolved of a failure to preserve evidence by providing sufficient notice and a full and fair opportunity to inspect the evidence to a noncustodial party.

■ At this point, it is prudent for us to add a couple of points of clarification as to the scope of this rule. Under this rule, notice and a full and fair opportunity to inspect will not excuse a failure to preserve evidence where a party destroys evidence without a legitimate need to do so, or destroys evidence in bad faith. Similarly, our decision today does not deal with the situation where evidence is destroyed unintentionally. It appears from the record that the evidence in this case was destroyed intentionally, regardless of good or bad faith. Thus, the question of whether sanctions are appropriate when evidence is destroyed by accident or unintentionally, for example by the passage of time, is not before us, and we need not, and do not, decide it. In sum, our decision today is limited to a determination of what notice is sufficient to absolve a custodial party of intentional destruction of evidence when the custodial party has a legitimate need to destroy the evidence and the destruction is not done in bad faith.

---

**3.** *See also Cooper v. United Vaccines, Inc.,* 117 F.Supp.2d 864, 875 (E.D.Wis.2000) (noting that custodial party should have informed noncustodial party of its intent to conduct destructive testing); *Howell v. Maytag,* 168 F.R.D. 502, 506–07 (M.D.Pa.1996) (holding that the custodial party could have satisfied its duty to retain evidence by giving notice of its intent to repair); *Baliotis v. McNeil,* 870 F.Supp. 1285, 1290–91 (M.D.Pa.1994) (holding that an opportunity for inspection should be provided before potentially relevant evidence is destroyed); *Hamilton Mut. Ins. Co. of Cincinnati v. Ford Motor Co.,* 122 Ohio App.3d 611, 702 N.E.2d 491, 493 (1997) (holding that, where the custodial party notified the noncustodial party that it intended to dispose of relevant evidence and the noncustodial party stated that it had no intention of inspecting the evidence, spoliation sanctions were not warranted).

**4.** *See, e.g., Hoffman,* 587 N.W.2d at 70 (holding that a party may avoid sanctions for spoliation by giving notice of a breach or a claim); *Smothers v. Ins. Restoration Specialist, Inc.,* No. A04–1036, 2005 WL 624511, at *6 (Minn. App. March 17, 2005) (holding district court did not abuse its discretion by excluding evidence as sanction on the basis that notice was insufficient when custodial party made two complaints to the noncustodial party, included the noncustodial party in a meeting to view the damage at issue in the lawsuit, and the Department of Commerce forwarded the noncustodial party a copy of the custodial party's letter to the Department of Commerce); *Garrison v. Farmers Co-Op. Exch.,* No. C1–00–657, 2000 WL 1693630, at *5–6 (Minn.App. Nov. 8, 2000) (holding that notice was insufficient when the noncustodial party was only made aware of damage, and not the possibility of a claim).

Our conclusion that a party satisfies his duty to preserve evidence by providing sufficient notice and a full and fair opportunity to inspect to a noncustodial party leads us to the next question—what is sufficient notice? Here, we must decide whether the court of appeals correctly concluded that Miller gave insufficient notice such that the district court's sanction for spoliation was not an abuse of discretion. Both the district court and the court of appeals held that Miller did not provide sufficient notice. *See Miller*, 776 N.W.2d at 739. When deciding this case, both the district court and the court of appeals relied on the 1998 court of appeals case of *Hoffman*, 587 N.W.2d at 66. In particular, the court of appeals said:

> [I]n order to provide a meaningful opportunity to correct defects, prepare for negotiation or litigation, and safeguard against stale claims, as required by *Hoffman*, we conclude that a party must provide *actual notice of the nature and timing of any action* that could lead to destruction of evidence and afford a reasonable amount of time from the date of the notice to inspect and preserve evidence.

*Miller*, 776 N.W.2d at 738 (emphasis added).

We conclude that *Hoffman*, while instructive, is limited by its specific facts. In *Hoffman*, the plaintiff's new Ford Taurus automobile caught fire while parked in the plaintiff's garage. 587 N.W.2d at 68. After the fire, a deputy fire marshal investigated the cause of the fire and took photographs of the garage and the automobile. *Id.* The plaintiff called the Ford dealership where he purchased the Taurus to cancel a service appointment and to request copies of the sales invoice, loan papers, and the warranty. *Id.* He told an employee at the dealership "my new Ford Taurus started on fire in my garage and

burned my whole house down." *Id.* A second fire occurred two days later. *Id.* On the day of the second fire, the Ford dealership sent a fax message to the plaintiff promising to discuss options with the plaintiff and apologizing for the first incident. *Id.* The plaintiff's garage and home were demolished before they could be inspected by the Ford dealership. The plaintiff subsequently took the Taurus to a salvage yard where it was inspected by experts for both parties. *Id.*

After the plaintiff in *Hoffman* commenced an action against the Ford Motor Company, Ford moved for spoliation of evidence sanctions, which the district court imposed. *Id.* at 68–70. The court of appeals affirmed. *Id.* at 72. In *Hoffman*, the court of appeals stated: "[T]o be sufficient in content, a spoliation notice must reasonably notify the recipient of a breach or a claim." *Id.* at 70. The court then noted that the only notice that the plaintiff had provided to Ford consisted of a single telephone call to the Ford dealership, during which the plaintiff did not discuss a breach of warranty or other potential claim. *Id.* at 70–71. Because the court of appeals in *Hoffman* concluded that the plaintiff failed to meet even this low standard for notice, there was no occasion to go beyond a threshold rule. Therefore, because *Hoffman* is limited in its scope, we conclude that it does not provide a comprehensive statement of a rule regarding sufficiency of a notice of spoliation of critical evidence.

■ Having concluded that *Hoffman* does not provide adequate guidance to articulate an appropriate standard, we proceed to determine what is an appropriate standard to measure the sufficiency of a spoliation notice. Decisions from other jurisdictions demonstrate that, when a party has sufficient knowledge to protect its interests and nevertheless does nothing, it is

inappropriate to sanction the custodial party. In *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001), the Second Circuit held that sanctions were not appropriate when the noncustodial party was notified that evidence might be destroyed and did not request an opportunity to view the evidence. In *Thiele v. Oddy's Auto and Marine, Inc.*, 906 F.Supp. 158, 162 (W.D.N.Y.1995), a federal district court concluded that, when a noncustodial party has knowledge of the impending destruction of evidence and does nothing, sanctions are not appropriate. In *Searock v. Stripling*, 736 F.2d 650, 654–55 (11th Cir. 1984), the Eleventh Circuit held that, when the noncustodial party made no effort to obtain evidence that was later destroyed, sanctions were not appropriate. In *Robertet Flavors, Inc. v. Tri–Form Construction, Inc.*, 203 N.J. 252, 1 A.3d 658, 676 (2010), the New Jersey Supreme Court stated:

> Courts ... should also recognize that the non-spoliating party may bear some of the responsibility for the loss of the evidence. A contractor, for example, that is called back to the building repeatedly but that merely glances at the work and makes little effort to identify a cause ... will have less ground to complain when the owner seeks assistance from others.

We agree with the foregoing case law that an important factor to consider when determining effective notice should be whether the noncustodial parties had sufficient knowledge to protect themselves.

 In this case, the court of appeals concluded that "a party must provide *actual notice of the nature and timing of any action* that could lead to destruction of evidence." *Miller*, 776 N.W.2d at 738 (emphasis added). Based on our foregoing analysis, we conclude that an absolute notice requirement, like the one used by the court of appeals, is unreasonable for at least two reasons. First, such an absolute requirement may be unfair to a custodial party who has already given substantial notice of a breach or claim, and that notice is sufficient to allow the noncustodial parties to protect their interests. When a custodial party has given such notice to the noncustodial parties, we should not deprive the custodial party of the critical evidence because of a failure to strictly observe a rigid requirement. Second, such an absolute notice requirement may not reduce uncertainty. Instead, it may lead to litigation over how much time and opportunity a custodial party must give to noncustodial parties to inspect the evidence. Accordingly, we decline to adopt an absolute notice requirement. We also acknowledge that any rule we adopt must also be sensitive to the fact-intensive nature of spoliation cases.

 We conclude that, when considering whether to impose sanctions for the spoliation of evidence, a court should consider the totality of the circumstances in determining whether the notice given was sufficient to satisfy a custodial party's duty to preserve evidence. Therefore, when a custodial party with a legitimate need to destroy evidence gives notice that is sufficient for the noncustodial parties to protect themselves by taking steps to inspect or preserve the evidence and the noncustodial parties nevertheless do nothing to inspect the evidence, sanctions for spoliation may not be appropriate.[5]

---

5. The nature of the evidence in a given case will have a bearing on the sufficiency of notice. In products liability cases, and cases involving automobiles, courts may more often require affirmative notice of destruction. While the nature of products liability cases will more often make sanctions for spoliation appropriate, the fact that courts may more

In articulating our rule on the sufficiency of notice, we also reaffirm the fundamental duty of every party to preserve relevant evidence for use in litigation, and emphasize that our rule in no way mitigates the duty of custodial parties to give noncustodial parties a full and fair opportunity to examine relevant evidence. *See Patton*, 538 N.W.2d at 119. We also reaffirm the district courts inherent authority to sanction parties who destroy evidence. *Id.* Our notice rule is designed to be compatible with these fundamental principles.

A meeting or a letter indicating the time and nature of any action likely to lead to destruction of the evidence, and offering a full and fair opportunity to inspect will usually be sufficient to satisfy our notice rule. Moreover, it is the better practice to explicitly provide such a notice, and particularly to provide it in written form. Nevertheless, we conclude that when a court is able to determine that noncustodial parties had sufficient knowledge to protect their interests, but nonetheless failed to inspect important evidence, failure of the custodial party to provide further notice of destruction in and of itself should not deprive the custodial party of an otherwise valid claim or defense.

The rule we articulate today is consistent with the factors set out in *Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 79 (3d Cir.1994). In *Schmid*, the Third Circuit outlined three factors for use in determining whether a sanction is appropriate for spoliation of evidence. *Id.* These factors are:

(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*Id.* The *Schmid* factors are also compatible with our holding in *Patton*. Our decision in *Patton* and the Third Circuit's decision in *Schmid* derive from common ancestry— *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267 (8th Cir.1993). Like *Schmid*, *Patton* cites as relevant factors—though in different language—the degree of fault of the custodial party, the prejudice to the noncustodial party, and the district court's duty to tailor the sanction. *See Patton*, 538 N.W.2d at 119; *Schmid*, 13 F.3d at 78.

Moreover, *Schmid* is consistent with our conclusion that giving sufficient notice will generally excuse intentional destruction of evidence when destruction is not done in bad faith. The Third Circuit did not explain how the *Schmid* factors take into account the giving of notice of destruction of evidence by a custodial party to a noncustodial party. But courts from other jurisdictions utilizing the *Schmid* factors have analyzed notice using two general approaches. Under the first approach, courts appear to treat *any* destruction of evidence, whether or not notice is given, as a breach of the duty to preserve evidence.

often set a higher standard in products liability and automobile cases can best be explained by a difference in factual circumstances, and not by different policy concerns. Specifically, it may simply be less burdensome to maintain products liability and automobile evidence for a longer period of time, and therefore, a custodial party will be less likely to have a legitimate need to destroy such evidence. For example, *see Howell v. Maytag*, 168 F.R.D. 502, 506 (M.D.Pa.1996), in which the court said that "maintaining the house in its damaged state would presumably have lengthened the time in which the plaintiffs were displaced from their residence. The burden of such a displacement far exceeds the mere expense of storing damaged property, as courts have required in many spoliation cases."

These courts appear to analyze notice as a factor to be considered when evaluating fault, the first *Schmid* factor. Under the second approach, courts appear to analyze notice as a factor to be considered when determining whether a custodial party has breached the duty to preserve evidence.

Under the first approach using the *Schmid* factors, it appears that *any* intentional destruction of evidence constitutes a breach of the duty to preserve evidence, and the district court may apply the *Schmid* factors to determine the relevant sanction, if any. *See, e.g., Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir.1995) ("[W]hen a proponent's intentional conduct contributes to the loss or destruction of evidence, the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct."). Under the framework in this first approach, the question whether notice is sufficient may be analyzed under the fault prong of *Schmid*. *See Baliotis*, 870 F.Supp. at 1290–91; *In re Wechsler*, 121 F.Supp.2d 404, 419–22 (D.Del.2000) (holding that, when a party asks for preservation of the material, even a prior opportunity to inspect will not discharge duty to preserve evidence). It appears that under this approach providing sufficient notice will generally render a custodial party blameless. *Baliotis*, 870 F.Supp. at 1290–91; *Wechsler*, 121 F.Supp.2d at 419–22. Therefore, under this analytical framework, where a noncustodial party does not act to protect itself against the loss of evidence, notice will generally by itself render sanctions inappropriate.

Under the second approach, courts appear to frame the question of notice as a factor in the question of duty, not in the question of fault. *See, e.g., Allstate*, 473 F.3d at 458 (holding that the duty to preserve evidence does not continue indefinitely). Under this analytical framework, it appears that the question of whether adequate notice was given is analyzed as part of the duty to preserve evidence. If notice is given, the duty has not been breached, and a court will have no occasion to consider the *Schmid* factors. While we can envision that there may be a case in which a custodial party's destruction of evidence is sufficiently egregious that sanctions will be appropriate notwithstanding notice, such a case is not before us. Therefore, it appears that under either approach that courts have taken when analyzing notice under the *Schmid* factors, the giving of sufficient notice will render sanctions inappropriate.

For all the foregoing reasons, we conclude that *Schmid* is not only informative but is also consistent with our conclusion that sanctions are not appropriate when the custodial party has a legitimate need to destroy evidence, and it appears from the totality of the circumstances that noncustodial parties have received sufficient notice to protect themselves by taking steps to inspect or preserve the evidence and nevertheless do nothing.

With the foregoing analytical framework in mind, we next address the specific facts of the case before us. Here, the district court concluded that "[t]he defendants did not have sufficient notice that the evidence would be destroyed or that a claim was being sought against them." Based on this conclusion, the court held that the notice given by Miller was insufficient, and sanctions were warranted. The court of appeals agreed with the district court, concluding that a custodial party must "provide actual notice of the nature and timing of any action that could lead to destruction of evidence." *Miller*, 776 N.W.2d at 738. But today we conclude that a custodial party is not bound by a rigid rule to

provide actual notice of the nature and timing of any action that could lead to the destruction of relevant evidence. Rather, a custodial party must provide sufficient notice and a full and fair opportunity to inspect the evidence so that the noncustodial parties can protect their interests with respect to the relevant evidence that may be destroyed.

■ Because the district court and court of appeals used a test that is inconsistent with the test we articulate today, we reverse and remand for further proceedings consistent with this opinion. On remand, the district court should determine whether Miller was under a duty to preserve critical evidence, and nevertheless intentionally destroyed that evidence. If so, the district court should determine whether Miller had a legitimate reason to destroy the evidence, and whether he provided notice sufficient to enable the respondents to protect themselves by inspecting the relevant evidence. After making these determinations, the court should determine whether imposition of sanctions for spoliation is appropriate and, if so, whether it is appropriate to exclude all of Miller's expert reports and testimony relating to moisture intrusion and the extent of mold or if some lesser sanction is more appropriate.

## II.

Miller asserted in his brief and at oral argument that the district court erred when it concluded that any relief under Count VIII of his complaint—alleging that Lankow and Betz violated the disclosure statute, Minn.Stat. § 513.55—was barred by the limitations period in Minn.Stat. § 513.57. Miller did not raise this issue in his petition for review to our court. We conclude that this issue is not properly before us. We said in *In re GlaxoSmithKline PLC*, 699 N.W.2d 749, 757 (Minn.

2005): "Generally, we do not address issues that were not raised in a petition for review." *See also Nw. Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche*, 535 N.W.2d 612, 613 n. 1 (Minn.1995); *Hapka v. Paquin Farms*, 458 N.W.2d 683, 685–86 (Minn.1990). Because Miller did not raise his claim under Minn.Stat. § 513.55 in his petition for review, it is not properly before our court and therefore, we decline to address this argument.

Reversed and remanded.