2021 UT App 71

# THE UTAH COURT OF APPEALS

DIVERSIFIED CONCEPTS LLC; DARIN DYELL; AND LANDFORM
DESIGN GROUP PC,
*Appellants,*
*v.*
JILL KOFORD AND ROD KOFORD,
*Appellees.*

Opinion
No. 20191071-CA
Filed July 1, 2021

Second District Court, Ogden Department
The Honorable Camille L. Neider
No. 150903526

S. Spencer Brown and Jack D. Smart,
Attorneys for Appellants Diversified Concepts LLC
and Darin Dyell

Brad M. Liddell, Attorney for Appellant
Landform Design Group PC

Matthew A. Bartlett and Matthew G. Koyle,
Attorneys for Appellees

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

MORTENSEN, Judge:

¶1     Jill and Rod Koford set about to improve the grounds surrounding their home. This project would include the design and construction of extensive rock retaining walls. These walls were so large, in fact, that the city required that the plans for their construction be engineered, and the walls be built following those engineered plans. The Kofords engaged Appellants Diversified Concepts LLC and Darin Dyell

(collectively, Diversified) along with Landform Design Group PC (Landform), to design and construct the walls. The Kofords allege that they fired both Landform and Diversified after noticing the walls starting to fall apart before the project was even finished. Both sides hired counsel and letters were exchanged. But before filing a lawsuit, the Kofords hired other contractors to completely dismantle the walls and rebuild them. When the Kofords eventually filed suit, Landform and Diversified each moved to dismiss the lawsuit as a sanction for spoliation. They claimed that, without an opportunity to inspect and observe the demolition of the walls, their ability to defend the case had been irreparably compromised. The district court denied the motions. Landform and Diversified bring this interlocutory appeal of the district court's order declining to dismiss the Kofords' case as a sanction for spoliation. Because we set forth a new and clarified framework that courts should apply when evaluating sanctions for spoliation under rule 37 of the Utah Rules of Civil Procedure, we vacate and remand to the district court to apply this framework in the first instance.

## BACKGROUND[1]

¶2    In 2012 the Kofords decided to comprehensively remodel the backyard of their home in Ogden, Utah, which was situated on a hill with a significant slope. The Kofords wanted to add various features for their enjoyment such as a pool, a playground, and planters. Significant landscaping was required to accommodate the remodel, including the addition of several large retaining walls. Because of the walls' size, the city

---

1. Because this case comes to us on interlocutory appeal, and no evidentiary hearing occurred below, the facts have yet to be determined. We recount the facts as alleged in the Kofords' complaint, as represented by the parties in their memoranda submitted to the district court (including deposition transcripts), and as referenced at the oral argument before the district court.

conditioned a building permit on the walls being engineered to ensure they would not collapse.

¶3     The Kofords hired Landform to act as the project manager of the remodel. To facilitate the hiring of the contractors, Landform was obligated to gather bids and recommend to the Kofords which contractors to select. Landform agreed to work directly with the contractors and consultants, supervise them, and steer the project by collaborating with the Kofords and contractors to determine which portions of the remodel should be worked on and when.

¶4     On Landform's recommendation, the Kofords hired Diversified as the contractor to construct the retaining walls. Diversified hired an engineering firm (Engineering Firm) to comply with the city's permit conditions. And to that end, Engineering Firm planned exactly how to engineer the retaining walls according to the proposed dimensions and placement of the walls. Diversified was provided with these plans and was to contact Engineering Firm when construction was underway so that the latter could undertake soil compaction and material testing, and otherwise ensure that the retaining walls were constructed according to plans.

¶5     Diversified started constructing the retaining walls in July 2013. As alleged by the Kofords, Diversified had trouble performing the work in a timely manner and was still working on the project into the spring of 2014. Jill Koford represented that it was around this time that the Kofords noticed that numerous retaining walls had started sinking, some had started to bow in the middle, and another was not straight. She further alleged that, "all over the property," gravel was leaking out of the seams of the walls and wall caps were coming off. Moreover, she asserted that Diversified had deviated from the landscape blueprint by constructing one large wall (in the place of two, with one designed to be recessed behind the other) in a different shape than was specified.

¶6 The Kofords claim they raised these concerns with both Landform and Diversified. In response, it appears the Kofords were essentially told that what they were observing was a "normal" part of the walls settling. As to the wall that deviated from the landscape blueprint, Landform apparently told the Kofords that the deviation was necessary because the wall as represented in the blueprint "couldn't be engineered," and Landform allowed the deviation because it "didn't really have options" and "thought aesthetically it tied in to everything else and looked great." Thereafter, the Kofords hired an attorney.

¶7 On June 27, 2014, the Kofords' attorney sent a letter[2] to Diversified, which he copied to Landform, detailing the Kofords' various concerns. One section of that letter read:

> In addition to the sod, there remain numerous issues with the project that need to be resolved either by repair, completion or an offset to the Kofords. Those issues include . . . two bowed retaining wall[s] . . . [W]e ask that you contact us immediately to indicate how you intend to remedy the above referenced issue. If we do not hear from you within five (5) business days, we will assume that you have no intention of performing remedial work and will seek to have another contractor finish and/or repair your work.

¶8 On July 1, 2014, the Kofords' attorney sent separate letters to Landform and Diversified, informing both that they had been terminated from the project. The letter to Landform explained that it had provided "very little if any oversight, observation or advice as is required by" its contract with the Kofords and that all communications should go through their attorney. The letter

---

2. While there is some dispute regarding whether both Landform and Diversified received all the letters sent by the Kofords' attorney, the contents of the letters are undisputed.

to Diversified explained that the Kofords had "hired another group to complete and/or repair the work done on their project," and it demanded receipts for purchases Diversified made in connection with the project, stating that if the receipts were not provided, the Kofords would "have no choice but to pursue the disclosure of that information through legal and/or administrative action."

¶9 Sometime later in July 2014, employees of the company that manufactured the materials used to construct the Kofords' retaining walls visited the property. Based on the manufacturer's recommendation, the Kofords had a forensic engineer (Forensic Engineer) inspect the property in early August 2014. After visually inspecting the walls and taking various measurements, Forensic Engineer identified numerous issues with bowing and leaning walls. However, he determined that he could not offer a definitive opinion about the cause of the issues unless the walls were partially removed and the foundation was examined.

¶10 Around the same time, the Kofords contacted Engineering Firm—which should have been supervising the site the whole time to ensure that the ongoing construction matched its engineering plans. Engineering Firm informed the Kofords that it had never been in their backyard because, after handing their plans over to Diversified, it was never contacted by Diversified or Landform. Shortly thereafter, Engineering Firm inspected the walls, took numerous photographs, and agreed with the preliminary findings of Forensic Engineer. Seeming to reference the wall that deviated from the landscape blueprint, Engineering Firm specifically noted this wall was pulling away from the house, which indicated improper installation.

¶11 On August 22, 2014, the Kofords' attorney sent another letter to Diversified, with a copy to Landform, informing Diversified of the recent developments. In relevant part, that letter stated:

> Over the past several weeks, we have spent a considerable amount of time, effort and expense investigating the nature and cause of several problems with the [Kofords'] project (i.e. bulging walls, leaking fill, cracking and/or broken pavers, etc.).
>
> After meeting with a number of industry experts and representatives from several product manufacturers and having those experts and representatives inspect the project, we now believe that the majority of the problems with the project are the result(s) of inferior workmanship and/or failure to follow the approved engineering plan obtained from [Engineering Firm] . . . . The problems with the project are so significant that they necessitate repairs and remedial work which will potentially cost hundreds of thousands of dollars.

The letter stated that the Kofords would "look to [Diversified] to pay for those repairs and to make them whole," and requested certain information "to assist the Kofords in mitigating their damages." The letter concluded by warning that if the information was not sent within five days, the Kofords would have "no choice but to initiate legal action against [Diversified]."

¶12    On October 1, 2014, the Kofords' attorney sent a letter to Diversified's counsel.[3] This letter stated that the Kofords had hired Forensic Engineer and explained:

---

3. The Kofords contend that a copy of the October 1 letter was sent to Landform. That contention is disputed and is unresolved. *See infra* ¶ 48. Diversified does not dispute that it received the letter.

[Forensic Engineer] has performed an initial walk through of the property and has indicated that the movement observed in the walls . . . is likely due to faulty construction and in particular faulty mechanically stabilized earth. [Forensic Engineer] is currently in the process of taking measurements at the property to determine the amount to which the construction is outside the acceptable tolerances. . . . [I]t is anticipated that [Forensic Engineer] will (at a cost of between $5,000 and $20,000) be required to dismantle a portion of the walls and do further tests on the mechanically stabilized earth behind and beneath those walls.

¶13    In February 2015, the Kofords had a new contractor tear down and replace two of the retaining walls, and they hired Engineering Firm to document it. Engineering Firm reported a number of problems with how these two walls had originally been installed: the soil had not been compacted properly, the geogrid[4] was improperly installed, and there was trash and drainage behind the walls. The Kofords testified that they were "terrified" about what the destruction of these two walls revealed, and consequently they made the decision to tear down and reconstruct the rest of the walls. Jill Koford testified in her deposition that while Engineering Firm did not specifically provide the Kofords with an opinion that the rest of the walls needed to be removed, Engineering Firm did tell her something along the lines of, "This is what I found, and if I had these giant

---

4. "Geogrid is a high density polyethylene or polyester fabric that, when placed between layers of soil and joined to a retaining wall, creates cohesion among loose soil particles for durable soil reinforcement, ties the wall into the surrounding landscape, and increases the strength of the wall." *Economides v. District of Columbia Board of Zoning Adjustment*, 954 A.2d 427, 431 n.2 (D.C. 2008).

walls in my backyard and I had found this kind of construction, I would reconstruct them." Engineering Firm documented the destruction of the remaining walls and put its findings into a written report. Jill Koford also testified that Engineering Firm took thousands of pictures during the deconstruction.

¶14     In June 2015, the Kofords filed a lawsuit against Landform and Diversified, bringing various causes of action relating to Diversified's installation of the retaining walls and Landform's obligation to supervise Diversified. After the completion of some discovery, Landform and Diversified each moved for sanctions under rule 37 of the Utah Rules of Civil Procedure, requesting that the district court dismiss the Kofords' case in its entirety as a sanction for spoliation, alleging that the Kofords had intentionally destroyed the subject of the litigation when they tore down and replaced the retaining walls.

¶15     The district court recognized that "Utah Appellate Courts have not directly addressed Rule 37 Spoliation claims," and applied case law from other jurisdictions in deciding the motions.[5] In so doing, the court recognized that the factual record before it was undeveloped, and it thus reserved consideration of certain sanctions until after further discovery. However, based on the letters that the Kofords' attorney sent to Landform and Diversified, the district court declined to dismiss the case outright, or to even dismiss certain claims. Specifically, the court determined that the letters the Kofords' attorney sent in June and July had provided "general notice" of anticipated litigation, reasoned that general notice shifted the onus to Landform and Diversified to investigate and to take action to preserve evidence, and thus concluded that neither should be "rewarded" by the dismissal of the case. In other words, the court focused less on the Kofords' duty to preserve evidence and

---

5. We laud the district court's efforts to dissect these thorny issues and wade into nuanced issues with little jurisprudence to guide it.

instead relied more on an implicit duty to investigate on the part of Landform and Diversified.

¶16   Landform and Diversified now bring this interlocutory appeal. They contend that the district court's only proper course of action was to dismiss the case outright.


ISSUE AND STANDARD OF REVIEW

¶17   Landform and Diversified contend the district court erred by declining to dismiss the Kofords' case as a sanction for destroying the retaining walls that are the subject of the litigation. "[D]istrict courts are granted a great deal of deference in selecting discovery sanctions, and we overturn a sanction only in cases evidencing a clear abuse of discretion." *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957. "Our deferential review recognizes that trial courts must deal first hand with the parties and the discovery process." *Id.* (cleaned up). With that said, "an abuse of discretion may be demonstrated by showing that the district court relied on an erroneous conclusion of law." *Id.* (cleaned up). In other words, "an exercise of discretion guided by an erroneous legal conclusion is reversible." *Coroles v. State*, 2015 UT 48, ¶ 24, 349 P.3d 739; *see also Gilbert Dev. Corp. v. Wardley Corp.*, 2010 UT App 361, ¶ 21, 246 P.3d 131 ("Whether a duty exists is a purely legal question . . . ." (cleaned up)).


ANALYSIS

I. Clarifying the law

¶18   As recognized by the district court, Utah appellate courts have had seldom opportunity to address the issue of spoliation. Spoliation is currently treated as a discovery issue that is governed by the Utah Rules of Civil Procedure, as the Utah Supreme Court has expressly rejected spoliation as a standalone cause of action. *See Hills v. United Parcel Service, Inc.*,

2010 UT 39, ¶¶ 31–33, 232 P.3d 1049 (declining to adopt the tort of spoliation); *Daynight, LLC v. Mobilight, Inc.*, 2011 UT App 28, ¶ 2, 248 P.3d 1010 (addressing spoliation under our rules of civil procedure). Specifically, rule 37(e) of the Utah Rules of Civil Procedure empowers our courts to sanction a litigant that "destroys, conceals, alters, tampers with or fails to preserve a document, tangible item, electronic data or other evidence." *See also Hills*, 2010 UT 39, ¶ 16 (noting that spoliation includes "destruction, mutilation, alteration, or concealment of evidence" (cleaned up)).[6] Now, we attempt to provide our courts with a framework to guide the exercise of their discretion in deciding when and how to sanction litigants for spoliation. And we do so with the benefit of jurisprudence from numerous state and federal courts that, with some notable differences, have crafted a largely uniform framework.

A.     Determining when a party may be sanctioned

¶19    We first answer the question of when a party may be sanctioned for the destruction of evidence. As we discuss, the court must first find that the custodial party was under a duty to preserve evidence, and that it violated that duty. At that point, the court has the discretion to impose sanctions for spoliation. But if the custodial party did not violate its duty to preserve, it may not be sanctioned for spoliation. And this is true whether the custodial party was never under a duty to preserve or, in the alternative, if the custodial party discharged its duty to preserve prior to the destruction of evidence.

---

6. For clarity and convenience, throughout this opinion we refer to spoliation singularly as the destruction of evidence. By so doing, we do not mean to exclude other forms of spoliation such as the alteration or disposal of evidence from the scope of this ruling.

1.      Duty to preserve

¶20    As rule 37 of the Utah Rules of Civil Procedure acknowledges, sanctionable spoliation of evidence occurs when a litigant destroys evidence "in violation of a duty." Utah R. Civ. P. 37(e); *see also Montana State Univ.-Bozeman v. Montana First Jud. Dist. Court*, 2018 MT 220, ¶ 23, 426 P.3d 541 ("Sanctionable spoliation occurs only upon the breach of a duty to preserve the subject evidence."); *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) ("A party can only be sanctioned for destroying evidence if it had a duty to preserve it." (cleaned up)). So, before a district court may sanction a party for spoliation, it must first determine that the spoliation occurred while the party was under a duty to preserve the evidence.

¶21    While it perhaps goes without saying that all parties to pending litigation have a duty to preserve evidence, a lawsuit need not have been filed for the duty to arise. *See Montana State*, 2018 MT 220, ¶ 23 (explaining that once litigation is pending, federal and state rules of civil procedure governing the duty to disclose evidence imply a concomitant duty to preserve evidence); *Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1195 (D. Utah 2011) ("In most cases, the duty to preserve is triggered by the filing of a lawsuit, but that duty may arise even before a lawsuit is filed."). Rather, "the duty to preserve evidence begins when litigation is 'pending or reasonably foreseeable.'" *Micron Tech.*, 645 F.3d at 1320 (quoting *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Id.* And as to the scope of the duty, it applies to "then-existing items or information reasonably likely to be relevant to, or likely to lead to the discovery of evidence relevant to, claims or defenses at issue in the contemplated litigation." *Montana State*, 2018 MT 220, ¶ 24; *see also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("[A]nyone who anticipates being a party or is a party to a lawsuit must not

destroy unique, relevant evidence that might be useful to an adversary.").

¶22 Once a district court determines that a custodial party has violated its duty to preserve evidence, the court has the inherent power to sanction the party for spoliation. *See* Utah R. Civ. P. 37(e) (noting the district court's inherent power to "take any action authorized by paragraph (b)" as a sanction for spoliation).[7] And like other jurisdictions, our existing case law has already clarified that the district court need not find that the party's failure to preserve was motivated by willfulness or bad faith.[8] *See Daynight, LLC v. Mobilight, Inc.*, 2011 UT App 28, ¶ 2, 248 P.3d 1010; *see also, e.g.*, *Miller v. Lankow*, 801 N.W.2d 120, 128 (Minn. 2011) (noting that the court "must" attempt to remedy

---

7. With that said, the same rule acknowledges that a district court's discretion to impose sanctions narrows when it concerns "electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Utah R. Civ. P. 37(e).

8. That a party must have failed to preserve items "reasonably" likely to be relevant demands that the custodial party have at least been negligent in failing to preserve. *See Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 19 (Tex. 2014) (explaining the duty is not breached unless the party at least negligently failed to preserve the evidence); *Montana State Univ.-Bozeman v. Montana First Jud. Dist. Court*, 2018 MT 220, ¶ 25, 426 P.3d 541 (same). But nothing is required beyond mere negligence for sanctions to be available; heightened culpability is relevant only to the *severity* of sanctions that are appropriate. *See Manorcare Health Services, Inc. v. Osmose Wood Preserving, Inc.*, 764 A.2d 475, 479 (N.J. Super. Ct. App. Div. 2001) ("The spoliator's level of intent, whether negligent or intentional, does not affect the spoliator's liability. Rather, it is a factor to be considered when determining the appropriate remedy for the spoliation." (cleaned up)).

spoliation with the appropriate sanction, "even when a breach of the duty to preserve evidence is not done in bad faith").

2.     Discharging the duty to preserve

¶23     But we also recognize that the duty to preserve is not boundless. *See Miller v. Lankow*, 801 N.W.2d 120, 128 (Minn. 2011); *American Family Mutual Ins. Co. v. Golke*, 2009 WI 81, ¶¶ 19–28, 768 N.W.2d 729.[9] In certain circumstances, a party may reasonably need to destroy material that it is presumptively duty-bound to preserve. *See Miller*, 801 N.W.2d at 128–29 (implying that remediating mold-damage was reasonable); *Golke*, 2009 WI 81, ¶¶ 2, 28 n.11 (stating that because the homeowners "needed a place to live," there was a legitimate reason to destroy the fire-damaged remnants of their home). For example, if an individual's home burns down, it seems reasonable to clear the debris so that the house can be rebuilt. But if the individual believes the fire was caused by a faulty appliance and intends to sue the manufacturer on that basis, clearing the debris would likely violate the duty to preserve.[10] In

---

9. We largely agree with, and thus throughout this section draw heavily from, the underlying rationale set forth by the Minnesota Supreme Court in *Miller v. Lankow*, 801 N.W.2d 120 (Minn. 2011), and the Wisconsin Supreme Court in *American Family Mutual Insurance Co. v. Golke*, 2009 WI 81, 768 N.W.2d 729—the two seminal cases to discuss the role of pre-destruction notice in either discharging a party's duty to preserve evidence or in the court's assessment of spoliation sanctions. However, our analysis contains its own nuances and thus does not move in lockstep with either case. *See infra* ¶¶ 26–33. Indeed, after drawing from these cases in articulating our approach to discharging the duty to preserve, we explain how our approach differs. *See infra* ¶¶ 30 n.12, 31–33.

10. It would likely not be sufficient for the homeowner to, for instance, simply save the allegedly faulty appliance and go

(continued…)

effect, the duty to preserve—if unyielding—would force the individual to choose between rebuilding the home or pursuing a lawsuit. *See Miller*, 801 N.W.2d at 128 (explaining that this would force a party to choose between remediating damage to the home "at the risk that any action to recover damages will be fatally compromised for spoliation of evidence" or preserving evidence by doing nothing).

¶24 Putting a custodial party in such a position would vitiate the purpose behind the very rules that the duty to preserve is designed to bulwark. *See* Utah R. Civ. P. 1 (stating that the rules of civil procedure are designed to "achieve the just, speedy, and inexpensive determination of every action"); *see also id.* R. 26 advisory committee's note (explaining that discovery rules should "advance" the "important objectives of the rules of civil procedure"); *accord* Fed. R. Civ. P. 26 advisory committee's notes to 1983 amendment (explaining that discovery rules should advance the "fundamental goal of the 'just, speedy, and inexpensive determination of every action'" (quoting *id.* R. 1)). So, any formulation of the duty to preserve must necessarily recognize and account for this conflict. Accordingly, the duty to preserve must allow, under certain circumstances, custodial parties to destroy evidence when they have reasonable grounds for doing so. *See Golke*, 2009 WI 81, ¶ 19 (holding that a party with a "legitimate reason" to destroy evidence may do so); *Miller*, 801 N.W.2d at 128 (explaining that "the duty to preserve evidence must be tempered by allowing custodial parties to dispose of or remediate evidence when the situation reasonably requires it"); *cf. Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 525 (D. Md. 2010) ("Breach of the preservation duty . . . is premised on reasonableness . . . .").

---

(…continued)
about rebuilding the home because that would deprive the manufacturer of examining the wiring of the home or any other alternative cause of the fire. *See generally, e.g., Howell v. Maytag*, 168 F.R.D. 502, 507 (M.D. Pa. 1996).

¶25 With that said, just because a custodial party has reasonable grounds to destroy evidence does not mean it can unilaterally do so. Instead, the custodial party must provide to the noncustodial party advance notice outlining its intention to destroy evidence. And that notice must be specific enough and be given far enough in advance to allow the noncustodial party to "protect itself against the loss of evidence," *see Miller*, 801 N.W.2d at 133, through a "full and fair opportunity to inspect" that evidence before its destruction, *see Golke*, 2009 WI 81, ¶ 28. Placing this burden on the custodial party balances the interests of the parties and, if complied with, effectively obviates any need for the court to impose spoliation sanctions. *See infra* ¶ 36 (explaining that spoliation sanctions are designed to punish and deter future violations, along with remedying the prejudice to the noncustodial party's case); *see also Golke*, 2009 WI 81, ¶ 29 ("This framework serves the judicial system's truth-seeking function and effectively prevents parties from prematurely destroying evidence.").[11]

---

11. *Cf. Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 458 (2d Cir. 2007) (holding that the district court abused its discretion by imposing a spoliation sanction where the noncustodial party was "provided a full opportunity to inspect the items"); *Silvestri v. General Motors Corp.*, 271 F.3d 583, 592 (4th Cir. 2001) (discussing that the custodial party breached the duty to preserve because it "failed to preserve material evidence" or "notify [the noncustodial party] of the availability of this evidence"); *Berwecky v. Montgomery Ward, Inc.*, 214 A.D.2d 936, 937 (N.Y. App. Div. 1995) ("Defendants were twice notified . . . that the refrigerator was available for inspection but that it would not remain so indefinitely . . . . Their delay in moving to protect their interests should not now work to their benefit." (cleaned up)); *Thiele v. Oddy's Auto & Marine, Inc.*, 906 F. Supp. 158, 160, 162 (W.D.N.Y. 1995) ("In none of the cited cases where spoliation sanctions were imposed did the defendant have the

(continued…)

¶26 In sum, a custodial party may discharge its duty to preserve evidence—thereby insulating it from spoliation sanctions—if it: (1) has reasonable grounds for destroying the evidence and (2) provides advance notice to the noncustodial party that allows for a full and fair opportunity to inspect that evidence. And, if challenged, the burden is on the custodial party to demonstrate that both elements have been met. We now discuss each criterion in more detail.

¶27 In assessing the first criterion, the court must obviously identify the reason for destruction. *See infra* ¶ 30. Inherently, the custodial party's reason will amount to an assertion that the evidence is burdensome to preserve and, as a result, it cannot reasonably do so. Accordingly, once the reason is identified, the court should evaluate the true extent of that burden and the custodial party's ability to bear it. *Cf. Golke*, 2009 WI 81, ¶ 29 (identifying the custodial party's ability "to bear the burden and expense of preserving" the evidence as a relevant factor). And in doing so, the court should be cognizant that reasonableness is not decided in a vacuum; the ultimate inquiry is whether the burden was serious enough to warrant the destruction of evidence, and in the manner and timing that it occurred. *See Fines v. Ressler Enters.*, 2012 ND 175, ¶ 13, 820 N.W.2d 688 ("There is no evidence before the Court that removal and replacement of the siding was in any way an emergency or that there was any other reason the project could not wait . . . ."); *cf. Golke*, 2009 WI 81, ¶ 29 ("Relevant facts might include the length of time evidence can be preserved . . . [and] the prejudice posed to possible adversaries by the destruction of the evidence . . . .").

¶28 Moving to the second criterion, as explained above, the purpose of providing advance notice is to allow the noncustodial party an opportunity to protect its interests in the litigation. To

_____

(…continued)
opportunity that [the noncustodial party] had to inspect the evidence . . . .").

afford the noncustodial party a full and fair opportunity to investigate the evidence such that the duty to preserve might be considered discharged, the custodial party must specifically inform the noncustodial party of the anticipated claim; the factual and legal basis for the claim; the evidence relevant to that claim which will be destroyed; the reason the evidence needs to be destroyed; the date on which the evidence will be destroyed; and that the noncustodial party may inspect the evidence prior to and contemporaneous with its destruction. In addition, the custodial party must provide notice far enough in advance to give the noncustodial party a reasonable opportunity to arrange an inspection or otherwise protect its interests. *See Golke*, 2009 WI 81, ¶ 28 (setting forth similar requirements).

¶29    Each of these requirements is necessary to adequately apprise the noncustodial party of the significance of the evidence to the litigation and allow that party to take steps either to preserve it or examine it prior to its destruction. *See Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp.*, No. 1:17-CV-00519-DCN, 2020 WL 2841517, at *21–22 (D. Idaho June 1, 2020) (explaining that because the noncustodial party only viewed the evidence when it did not anticipate litigation, it "did not have an adequate opportunity to run tests or analysis to defend against" the custodial party's eventual legal claims, and therefore the custodial party did not discharge its duty to preserve); *Harborview Office Center, LLC v. Camosy Inc.*, 2006 WI App 56U, ¶¶ 39, 46 (explaining that, even where the noncustodial party was able to view the remedial work, when the custodial party found an unanticipated cause of the damages and failed to relay that information to the noncustodial party, spoliation sanctions were warranted because the noncustodial party "had [no] reason to ask questions or suspect anything was amiss" with respect to that issue); *Fines*, 2012 ND 175, ¶ 11 ("Fines gave Ressler no notice of intent to remove the siding until all practical ability to have an expert inspect the siding in place was removed.").

¶30 The requirement that the notice include the custodial party's reason for destruction serves additional functions.[12] This requirement is important because it conveys the immediacy of the problem and allows the noncustodial party the opportunity, if appropriate or possible, to ameliorate the problem necessitating destruction. *See In re Wechsler*, 121 F. Supp. 2d 404, 419–21 (D. Del. 2000) (explaining that there was "no reason to destroy" the evidence where the noncustodial party "had already committed to paying the additional storage costs" that led to the initial need to destroy); *Hoffman v. Ford Motor Co.*, 587 N.W.2d 66, 70 (Minn. Ct. App. 1998) ("Notice provides the [noncustodial party] a chance to correct any defect." (cleaned up)). If the noncustodial party offers an accommodation that reasonably resolves the custodial party's reason for destruction, thereby obviating the need to destroy evidence, then the duty to preserve is not discharged. Additionally, this requirement serves a purely practical function: it limits the custodial party's ability to, in responding to a rule 37 motion, advance post-hoc explanations that played no part in its decision to destroy evidence. Obviously, post-hoc reasons that played no actual role in the custodial party's decision to destroy evidence should be ignored by the court.

¶31 In setting forth our specific requirements for discharging the duty to preserve, our approach is largely consistent with the two other seminal cases outlining the import and mechanics of pre-destruction notice. In *American Family Mutual Insurance Co. v. Golke*, the Wisconsin Supreme Court promulgated a similar approach that allows a party to discharge its duty to preserve, provided it has "a legitimate reason to destroy evidence," and "provid[es] the opposing party or potential litigant: (1) reasonable notice of a possible claim; (2) the basis for that claim;

---

12. We recognize that this requirement has not been explored in other spoliation cases dealing with the import of pre-destruction notice. However, for the reasons that follow, we believe that it is a necessary requirement.

(3) the existence of evidence relevant to the claim; and (4) reasonable opportunity to inspect that evidence." 2009 WI 81, ¶ 28. And in *Miller v. Lankow*, the Minnesota Supreme Court evaluated the role of pre-destruction notice but announced a less onerous requirement that, at first blush, might seem inconsistent with our requirements. *See* 801 N.W.2d at 134. Specifically, the *Miller* court held that the custodial party must only "provide[] notice sufficient to enable the [noncustodial parties] to protect themselves by inspecting the relevant evidence." *See id.* And the *Miller* court adopted this approach after expressing concern with the type of "actual notice" required by our discharge rule because,

> an absolute requirement may be unfair to a custodial party who has already given substantial notice of a breach or claim, and that notice is sufficient to allow the noncustodial parties to protect their interests. When a custodial party has given such notice to the noncustodial parties, we should not deprive the custodial party of the critical evidence because of a failure to strictly observe a rigid requirement.

*Id.* at 131; *see also id.* (rejecting the lower court's conclusion that "a party must provide *actual notice of the nature and timing of any action* that could lead to destruction of evidence" (cleaned up) (emphasis in original)). But the *Miller* court appears to have expressed this concern in the context of rejecting the notion that a party could discharge its duty to preserve and instead holding that "*any* destruction of evidence, whether or not notice is given, [i]s a breach of the duty to preserve evidence." *Id.* at 132–33. For the *Miller* court, the adequacy of the notice is instead a factor in assessing what type of sanctions should be imposed. *See id.* at 131–33 (explaining that some courts evaluate pre-destruction notice "as part of the duty to preserve evidence" such that the "court will have no occasion to consider the *Schmid* factors," i.e., the factors that inform

what type of sanction is warranted, but implicitly rejecting such an approach out of concern that bad faith destruction of evidence should be sanctionable notwithstanding whatever notice was provided).[13]

¶32　Our overall approach blends both the *Golke* and *Miller* approaches. As in *Golke*, our approach allows a custodial party to discharge its duty to preserve evidence, thereby preventing any sanctions for spoliation. A corollary of "discharging" a burden is that the custodial party must take affirmative steps to do so. And in this scenario, it is perfectly sensible to require the custodial party to relay specific information so as to provide "actual notice" of the nature of the evidence that will be destroyed and the anticipated timing of the destruction. To this end, our requirements clarify and expand upon the *Golke* factors, but they do not require Herculean efforts. Nevertheless, we agree with the *Miller* court that imperfect notice should not

13. Indeed, the *Miller* court found that the adequacy of the notice provided should be a factor evaluated under the framework set forth in *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3d Cir. 1994), for evaluating the appropriate sanction. *See Miller*, 801 N.W.2d at 132–33 (explaining that Minnesota courts had already been applying the *Schmid* framework, "though in different language"). This is the same framework that we direct our district courts to apply when fashioning the appropriate sanction for a violation of the duty to preserve. *See infra* ¶ 36. However, and to be abundantly clear, we disavow any notion that "sanctions are not appropriate," *see Miller*, 801 N.W.2d at 133, where a custodial party fails to satisfy our requirements for discharging the duty to preserve but nevertheless provides some, albeit inadequate, measure of pre-destruction notice. Indeed, it seems the exceedingly rare case where sanctions would not be appropriate if the duty to preserve has been violated. But if a party has provided some notice, even if that notice is insufficient to discharge the party's duty to preserve, that notice may mitigate the severity of the spoliation sanction.

simply be ignored altogether. Instead, where a party has not met the requirements to discharge its duty to preserve, the court may still consider the nature of any notice the party provided when determining what sanction to impose. *See infra* ¶¶ 39, 43 (explaining that notice is relevant to both culpability and prejudice—factors that inform the severity of the appropriate sanction).

¶33    With the foregoing in mind, we provide a brief review of the duty to preserve. Before sanctioning a custodial party for spoliation, the court should determine (A) whether the custodial party had a duty to preserve the evidence at issue, and (B) whether the custodial party violated that duty. In undertaking the latter inquiry, the district court must evaluate— if raised—whether the custodial party has demonstrated that it discharged its duty prior to destruction by (1) having reasonable grounds to destroy the evidence and (2) providing notice to the noncustodial party, far enough in advance to give the noncustodial party a reasonable opportunity to arrange an inspection or otherwise protect its interests, specifically informing it of (i) the anticipated claim; (ii) the factual and legal basis for the claim; (iii) the evidence relevant to that claim which will be destroyed; (iv) the reason why the evidence must be destroyed; (v) the date on which the evidence will be destroyed; and (vi) its opportunity to inspect the evidence.[14]

¶34    And with that, we turn to the next question: if the custodial party did violate its duty to preserve, how should the court evaluate what sanctions are appropriate?

---

14. For those seeking the safe harbor of discharge, and for all counsel advising clients as such, the best practice would be for custodial parties to put this notice in writing and to deliver the notice through a verifiable means such as certified mail.

B.    Evaluating what type of sanctions are appropriate

¶35    As with all discovery violations, the district court has broad discretion to choose the sanction it deems appropriate. *See Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957. Likewise, any sanction should be proportionate to the violation at issue; extreme sanctions that would otherwise cut against our "strong preference for resolving cases on their merits whenever possible," *see Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1319 (10th Cir. 2011), should be used as a last resort, *see Darrington v. Wade*, 812 P.2d 452, 456 (Utah Ct. App. 1991) ("[D]efault judgment is an unusually harsh sanction that should be meted out with caution . . . ."); *Yuanzong Fu v. Rhodes*, 2015 UT 59, ¶ 21, 355 P.3d 995 ("[W]e do encourage district courts imposing sanctions to consider alternative sanctions carefully before entering a default."). But spoliation is also unlike many other discovery violations because of its propensity to impede resolution of cases on their merits and because courts can be powerless to ameliorate the harm. *See Daynight, LLC v. Mobilight, Inc.*, 2011 UT App 28, ¶ 2, 248 P.3d 1010 (noting that unlike garden-variety "delay[s] in the production of evidence," spoliation necessarily entails the "permanent deprivation of evidence").

¶36    Accordingly, a district court fashioning a sanction for spoliation should keep in mind the general rule that sanctions should be proportional to the need to punish and deter future violations, and thus severe sanctions should be meted out with caution. But it must also be cognizant that "the focus in selecting the proper [spoliation] sanction is evening the playing field, or rectifying the prejudice caused by the spoliation so as to place the parties in equipoise," i.e., the sanction should "make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence." *See Robertet Flavors, Inc. v. Tri-Form Constr., Inc.*, 1 A.3d 658, 671 (N.J. 2010) (cleaned up). And balancing these competing considerations requires the district court to engage in a "careful evaluation of the particular facts and circumstances of the litigation" so that "the true impact

of the spoliated items can be assessed and an appropriate sanction imposed." *Id.* To guide this assessment, the district court should evaluate the totality of the circumstances under the framework set forth by the Third Circuit Court of Appeals in *Schmid v. Milwaukee Electric Tool Corp.*, which directs courts to consider:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

13 F.3d 76, 79 (3d Cir. 1994). The *Schmid* framework is a sensible balancing test that courts around the country have treated as *the* framework to be applied when fashioning a spoliation sanction. *See, e.g.*, *Micron Tech*, 645 F.3d at 1329 (applying the *Schmid* framework at face value); *Jordan F. Miller Corp. v. Mid-Continent Aircraft Service, Inc.*, No. 97-5089, 1998 WL 68879, at *4, *6 (10th Cir. Feb. 20, 1998) (using the *Schmid* framework as the basis for its analysis); *Story v. RAJ Props., Inc.*, 909 So. 2d 797, 802–03 (Ala. 2005) (articulating a five-factor test that substantively evaluates the same considerations); *Miller v. Lankow*, 801 N.W.2d 120, 132–33 (Minn. 2011) (referencing the *Schmid* framework and explaining that Minnesota courts had been substantively applying it); *Robertet Flavors*, 1 A.3d at 675–77 (applying the *Schmid* framework with more precision); *Fines v. Ressler Enters.*, 2012 ND 175, ¶ 8, 820 N.W.2d 688 (directing courts to consider the culpability of the spoliator, the degree of prejudice to the non-spoliator, and the availability of lesser sanctions); *Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 21 (Tex. 2014) (substantively applying the *Schmid* framework).

¶37   Generally, the *Schmid* framework directs a district court to weigh the impropriety of a custodial party's conduct against the

harm suffered by the noncustodial party resulting from the destruction of evidence, and then to fashion a sanction that accounts for them both. *See Schmid*, 13 F.3d at 79 ("Courts select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." (cleaned up)). And before we explain the three factors in more detail, it is important to note they are simply criteria for the district court to consider before imposing a sanction. *See Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992) (opining on the applicability of substantively similar factors). In other words, they "do not constitute a rigid test" that a district court must apply with trepidation.[15] *See id.* Any such rigidity would be inconsistent with the flexibility courts need to supervise the discovery process effectively. *See Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 102 (D. Colo. 1996). Instead, the considerations we outline are meant only to guide what amounts to the district court's "judgment call" on what type of sanction is appropriate in light of the particular facts and circumstances before it. *See id.*; *see also R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119 (explaining that "the standard articulated above will permit a case-by-case evaluation by the trial court, and flexibility to handle circumstances" unique to the case at hand). With this in mind, we discuss each factor in more detail.

1.     Custodial party's culpability

¶38    The first *Schmid* factor is principally meant to guide the district court in evaluating the severity of the sanction necessary to effectuate the twin purposes of punishment and deterrence. *See Schmid*, 13 F.3d at 79 (instructing courts to impose sanctions

---

15. The last thing we want to do is cause religious adherence to factors not found in any rule. *See Kamoe v. Ridge*, 2021 UT 5, ¶ 36, 483 P.3d 720 ("While these factors may certainly aid the . . . calculus, we have previously warned against inflexible reliance on a non-exhaustive list of common-law factors designed to merely facilitate a court's analysis.").

that will, "where the offending party is seriously at fault, . . . serve to deter such conduct by others in the future"). Accordingly, the district court should endeavor to make a factual finding about the mental state of the custodial party concerning the failure to preserve evidence. In the so-called "classic" case of spoliation, the custodial party willfully destroys evidence in bad faith, i.e., for the purpose of frustrating the judicial process. *See Story v. RAJ Props., Inc.*, 909 So. 2d 797, 804 (Ala. 2005) ("In a case of classic spoliation, the offending party purposefully and wrongfully destroyed evidence he knew was supportive of the interest of his opponent." (cleaned up)). And in such an instance, serious sanctions are likely warranted "because actions which are found to be deliberate and purposeful ought to be punished accordingly." *See Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 103 (D. Colo. 1996); *see also In re Wechsler*, 121 F. Supp. 2d 404, 428 (D. Del. 2000) ("Given this heightened degree of fault and personal responsibility [for intentionally destroying evidence to prevent inspection,] a severe sanction is entirely appropriate."). But "[w]here a judge finds no willfulness, bad faith or fault, there exists beneath these states of mind a broad panoply of unintentional conduct: recklessness, gross negligence, [and] negligence." *Gates Rubber*, 167 F.R.D. at 103; *see also Martin ex rel. Mulich v. Intex Recreational Corp.*, 858 F. Supp. 161, 163 (D. Kan. 1994) ("Destruction of potentially relevant evidence obviously occurs along a continuum of fault, ranging from innocence through degrees of negligence to intentionality."). And while this type of misconduct may, standing alone, be less worthy of serious sanctions, "the discretion to impose sanctions for reckless or negligent misconduct [remains] as broad as the discretion which is accorded for imposition of sanctions where the misconduct was deliberate and intentional." *Gates Rubber*, 167 F.R.D. at 103; *see also Silvestri v. General Motors Corp.*, 271 F.3d 583, 593 (4th Cir. 2001) ("[S]ometimes even the inadvertent, albeit negligent, loss of evidence will justify dismissal because of the resulting unfairness [to the noncustodial party's case].").

¶39 In determining the custodial party's mental state, the district court may take into account any consideration relevant under the circumstances. For example, the district court may evaluate the sophistication of the custodial party, *see Northern Assurance Co. v. Ware*, 145 F.R.D. 281, 283 (D. Me. 1993) (custodial party was not "a lay person, inexperienced in the conduct of litigation"), the manner in which the evidence was spoliated, *see Daynight, LLC v. Mobilight, Inc.*, 2011 UT App 28, ¶ 2, 248 P.3d 1010 (custodial party threw a laptop off a roof, ran over it with a vehicle, and made contemporaneous statements about going to prison for doing so), the timing of the spoliation, *see State Farm Fire & Cas. Co. v. Frigidaire*, 146 F.R.D. 160, 163 (N.D. Ill. 1992) (custodial party allowed evidence to be destroyed before filing suit but only after its experts had finished investigating the evidence), whether the custodial party ignored a discovery, preservation, or investigation request relating to the spoliated evidence, *see Story v. RAJ Props., Inc.*, 909 So. 2d 797, 805 (Ala. 2005) (custodial party ignored discovery requests and neglected to inform noncustodial party of impending destruction), and whether the custodial party took affirmative steps to allow the noncustodial party to investigate the evidence or otherwise preserve its interests in the litigation, *see Miller v. Lankow*, 801 N.W.2d 120, 133 (Minn. 2011) ("[N]otice [is] a factor to be considered when evaluating fault, the first *Schmid* factor."). Of course, this list is by no means exhaustive.

2.     Noncustodial party's degree of prejudice

¶40 The second *Schmid* factor is meant to guide the district court in evaluating what type of sanction is necessary to remedy the prejudice caused by the spoliation. *See Schmid*, 13 F.3d at 79 (instructing courts to choose a "sanction that will avoid substantial unfairness to the [noncustodial] party"). This requires the district court to determine the relevance and strength of the spoliated evidence to the claims at issue. *Compare id.* at 77, 79–80 (discussing that the prejudicial impact of the plaintiff's failure to preserve a circular saw was limited because the claim at issue was alleging a design defect), *with Fines v.*

*Ressler Enters.*, 2012 ND 175, ¶ 17, 820 N.W.2d 688 (discussing that removal of siding made it impossible for the contractor to defend against the allegation that its installation of the siding was faulty). And this determination necessarily requires the district court to evaluate the entire evidentiary landscape at the noncustodial party's disposal, particularly evaluating the relative sufficiency of any available substitutes for the spoliated evidence. *See Robertet Flavors, Inc. v. Tri-Form Constr., Inc.*, 1 A.3d 658, 675–76 (N.J. 2010) (explaining that "the prejudice to the non-spoliating party" is a function of, among other things, "the alternate sources of information that are, or are likely to be, available to the non-spoliator"); *Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 22 (Tex. 2014) ("The differences in kind and quality between the available evidence and the spoliated evidence will thus be a key factor in analyzing prejudice to the nonspoliating party."). This is a difficult task that is highly fact-dependent.

¶41 Often, the purported substitutes for the spoliated evidence are photographs or videos of the evidence taken or made by the custodial party, or evidence of other actions the custodial party took to investigate the evidence prior to destruction. Sometimes the substitute may be sufficient such that a sanction other than dismissal is warranted, but sometimes not. *Compare Baliotis v. McNeil*, 870 F. Supp. 1285, 1291–93 (M.D. Pa. 1994) ("Also mitigating the prejudice is the existence of scores of photographs and a lengthy video tape of the fire scene."), *with Fines*, 2012 ND 175, ¶¶ 13–14 (holding dismissal was warranted in part because pictures and video of allegedly improperly installed siding was an insufficient substitute for defendant's opportunity to have an "objective third party to testify" regarding the siding installation). And it is also possible that, by nature of the noncustodial party's actual involvement in the events leading up to litigation, its own testimony or documentation may be a sufficient—albeit imperfect—substitute. Again, the availability of other evidence may counsel against dismissal, but it may not. *Compare Robertet Flavors*, 1 A.3d at 663, 677–78 (declining to dismiss a claim against a noncustodial window installer in part because alternative

evidence in the form of "supporting documents or testimony from its personnel should [have] be[en] within its possession"), *with Brookshire Bros.*, 438 S.W.3d at 17 ("Testimony as to what the lost or destroyed evidence might have shown will not always restore the nonspoliating party to an approximation of its position if the evidence were available; sometimes a picture is indeed worth a thousand words.").

¶42 But this all raises the practical question of how the district court should go about evaluating the importance of "evidence that is no longer available for review." *Brookshire Bros.*, 438 S.W.3d at 22. The answer is this: the burden is on the noncustodial party to demonstrate the prejudice to its case. *See, e.g.*, *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996) ("The burden is on the aggrieved party to establish [prejudice]." (cleaned up)). It may well be that, in certain cases, the prejudice will be apparent and can be established through argument or lay witnesses. But, in other cases, demonstrating prejudice may require the testimony of an expert who explains why the evidence is important and why the proffered substitutes are insufficient. *See, e.g.*, *Fines*, 2012 ND 175, ¶ 23 (expert affidavit used to show prejudice); *Robertet Flavors*, 1 A.3d at 666–67 (expert testified at hearing and explained what his investigation would have consisted of and why he was unable to render an opinion in the absence of his own investigation); *Miner Dederick Constr., LLP v. Gulf Chem. & Metallurgical Corp.*, 403 S.W.3d 451, 470 (Tex. App. 2013) (expert "identified additional tests that he would have conducted" and explained why photographs of the spoliated evidence were insufficient); *Silvestri v. General Motors Corp.*, 271 F.3d 583, 588 (4th Cir. 2001) (expert explained that the failure to preserve hindered the defendant's ability to mount its case because a "crush" analysis was necessary, which could not be performed); *see also Fines*, 2012 ND 175, ¶¶ 23–26 (Maring, J., dissenting) (opining that the sanction of dismissal should be reversed, in part because the expert's affidavit was insufficient to show the degree of prejudice that would warrant that sanction).

¶43 Further, one more consideration is clearly in play: whether the noncustodial party unreasonably failed to take steps to investigate or preserve the spoliated evidence. *See Robertet Flavors*, 1 A.3d at 676 ("Courts evaluating prejudice should also recognize that the non-spoliating party may bear some of the responsibility for the loss of the evidence."). The need for the court to "even[] the playing field" sounds in equity, and where the noncustodial party acted unreasonably in protecting its interests in the evidence, this mitigates against the need for the district court to step in and "place the parties in equipoise." *Id.* at 671 (cleaned up); *see also Markel Ins. Co. v. Bottini Fuel*, 116 A.D.3d 1143, 1145 (N.Y. App. Div. 2014) ("However, the existence and alleged significance of this [evidence] . . . could also have been discovered through a timely inspection by defendants, had they elected to conduct one." (cleaned up)). So, even where the custodial party fails to discharge its duty to preserve, to the extent the court finds that the noncustodial party acted unreasonably under the circumstances in not taking steps to investigate or preserve the evidence, the court may take that inaction into account when determining the degree of prejudice suffered. Thus, if the custodial party fails to discharge its duty to preserve evidence, but the noncustodial party is nevertheless on notice of specific facts that render its failure to take any steps to preserve or inspect evidence unreasonable, there will be less cause for the court to remedy a situation that the noncustodial party failed to prioritize.[16] *See Robertet Flavors*, 1 A.3d at 676 ("A contractor, for example, that is called back to the building repeatedly but that merely glances at the work and makes little

16. We are not in a position to define the precise contours as to how a district court should fashion the eventual sanction if it finds that the noncustodial party could and should have taken steps to investigate or preserve the evidence—this is very much the district court's judgment call. But at the very least, it seems that it would be well within the court's discretion to find that total dismissal of the case would be unwarranted in light of such a finding.

effort to identify a cause, to document the conditions observed, or to effect a solution will have less ground to complain when the owner seeks assistance from others."); *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (explaining that the need for sanctions was minimized where it was "undisputed that [the noncustodial party] did not request to inspect the damaged shipping container after [the custodial party] notified it of the damage, nor at any time other than prior to it making the summary judgment motion").

3.      Fashioning the appropriate sanction

¶44     The third step of the *Schmid* framework is where the district court should weigh its findings on the foregoing factors and determine what sanction is appropriate in light of them. *See Schmid*, 13 F.3d at 79. If the court concludes that the custodial party destroyed evidence in bad faith, it is unlikely that severe sanctions will ever exceed the district court's discretion. *See Robertet Flavors, Inc. v. Tri-Form Constr., Inc.*, 1 A.3d 658, 676 (N.J. 2010). But, so long as the prejudice to the opposing party's case can be effectively remedied by the imposition of a lesser sanction, the court is not *required* to impose a severe sanction such as dismissal even if it finds that the evidence was destroyed in bad faith. *See id.* at 676–77 ("But even in those circumstances, if it is possible to return the parties to the status quo ante, or to limit the claims to those that can be tried fairly, the court *may elect* to address egregiousness through imposition of [lesser sanctions]." (emphasis added)). But regardless of the custodial party's culpability in destroying the evidence, the district court should always—at the very least—seek to impose a sanction that workably remedies the prejudice to the opposing party's case.[17] Further, the court should keep in mind that,

---

17. We are aware that some courts *require* a showing of willfulness or bad faith before severe sanctions like dismissal are warranted. *See, e.g., Golke*, 2009 WI 81, ¶ 42 ("We affirm that

(continued…)

> It will not always be possible to recreate the evidence that has been lost or to limit the claims so as to be fair to the non-spoliating party. In those circumstances, the severe sanction of dismissal may indeed be appropriate. Moreover, even after the claims are limited and the matter can fairly proceed, it will still be within the court's power to utilize other sanctions against the spoliator through the use of an adverse inference or the imposition of monetary sanctions designed to shift costs to the spoliator.

---

(…continued)

dismissal as a sanction for spoliation is appropriate only when the party in control of the evidence acted egregiously in destroying that evidence."). We disagree with this approach, finding it to be inconsistent with our view that spoliation sanctions are principally designed to remedy the prejudice to the noncustodial party's case. *See Robertet Flavors, Inc. v. Tri-Form Constr., Inc.*, 1 A.3d 658, 671 (N.J. 2010) ("[T]he focus in selecting the proper sanction is evening the playing field . . . ." (cleaned up)); *cf. Hamann v. Ridge Tool Co.*, 539 N.W.2d 753, 756–57 (Mich. Ct. App. 1995) (noting that court's view that "[w]hether the evidence was destroyed or lost accidently or in bad faith is irrelevant, because the opposing party suffered the same prejudice"). In other words, we view culpability functionally as a type of "plus-factor" that the district court may find justifies even the most severe sanctions, but there is no ceiling on the range of available sanctions in the absence of willfulness or bad faith. Instead, the focus should remain primarily on how hamstrung the noncustodial party is in prosecuting or defending its claims as a result of the spoliation—keeping in mind that if the noncustodial party played a part in hamstringing its own case, the court may understandably refrain from imposing severe sanctions.

*Id.* at 677. And we again reiterate that district courts have wide discretion in determining what sanction is warranted.

C.     Recapping the law

¶45     Where there is an allegation of spoliation, the district court should first determine whether the custodial party violated its duty to preserve the evidence at issue. If the duty was not violated, then sanctions may not be imposed. But if the duty was violated, the court should then assess what type of sanction should be imposed under the *Schmid* framework.

¶46     And within the overall spoliation inquiry, notice of destruction is relevant in determining if the duty to preserve was discharged *and*, in the event that the duty was not discharged, what type of sanction is appropriate under the *Schmid* framework. A party that provides notice sufficient to discharge its duty to preserve evidence may not be sanctioned because it has not violated its duty to preserve. But if the party failed to provide the detailed notice required by our discharge inquiry, the district court may still assess the import of the imperfect notice under the *Schmid* framework. Imperfect notice is a consideration that informs the first *Schmid* factor, as greater lengths to notify the noncustodial party about destruction tend to undermine the notion of willful or bad faith destruction. And imperfect notice is also relevant to the second *Schmid* factor, insofar as what and how it was conveyed to the noncustodial party renders unreasonable that party's failure to take steps to investigate or preserve the evidence.

## II. Reviewing the district court's order

¶47     We now turn to a review of the district court's order in this case. We first provide a brief summary of the motion hearing and the court's order, and then evaluate whether the district court abused its discretion.

¶48    At the motion hearing, the district court asked a number of questions about the alternative sources of evidence available to Landform and Diversified. The court was apprised that discovery was not complete and that they were not "past expert discovery." But the court was also informed that Engineering Firm took "hundreds of pictures" of the demolition of the walls "to inspect in a very detailed way what was going on and what the problems with the project were" and authored a report about its findings that was provided to Landform and Diversified. The court was then advised that Landform and Diversified had attempted to depose the employee from Engineering Firm who had actually taken the photos and authored the report, but they had not completed the deposition prior to the motion hearing. When the court was apprised that Diversified had hired its own expert, the court asked whether its expert had concluded that he could not "form an opinion because [he] couldn't go look at the property[.]" Diversified's counsel answered, "Yes," indicating that its expert stated he could not make a determination without seeing the walls themselves. But neither an expert report nor an expert affidavit was provided to the district court before or during the hearing. Moreover, the Kofords' counsel, who was provided with Diversified's expert report during mediation, told the court, "I don't recall the expert report saying what they've represented her[e] today . . . . Without getting too far into divulging mediation [,] . . . the report that I recall actually allowed him to set a dollar amount as to what he thought it would take to remedy the issues that he saw." The court was also apprised that there was a factual dispute as to whether Landform received the October 2014 letter.

¶49    At the end of the hearing, the district court indicated, "I don't see how I can dismiss the complaint in its entirety. I think there will be some measurement of what was known, when was it known and some more surgical precision as opposed to a complete dismissal." It further noted, "You may have and you may end up with expert reports that say we can't make a decision, we can't give an opinion, but I don't have those." The court thus intimated that it may have to delay the imposition of

sanctions "until trial to determine exactly what was known or what wasn't known or what could be reconstructed and what couldn't be reconstructed." The court finished by stating, "all I can say is I can't imagine, based on the research that [I have] done so far[,] . . . that this is going to get dismissed in its entirety."

¶50 The district court's written order went on to acknowledge the dearth of Utah case law on spoliation sanctions but indicated that it was "persuaded by other jurisdictions that have addressed the issue related to construction matters." Specifically, the court identified two cases that we have cited frequently in this opinion: *Miller v. Lankow*, 801 N.W.2d 120 (Minn. 2011) (expounding upon the import and ramifications of pre-destruction notice), and *Robertet Flavors, Inc. v. Tri-Form Construction, Inc.*, 1 A.3d 658 (N.J. 2010) (applying the *Schmid* factors and expanding upon them). The district court's written order, however, seemed to focus exclusively on the notice that the Kofords provided to Landform and Diversified before the walls were destroyed:

> It is clear that Plaintiffs were the custodial party of the property. The[re] is also clear evidence that both Defendants were on notice that legal action could be anticipated based on [the] June 27, 2014 and the two July 1, 2014, letters. Both Defendants had notice of [the] nature of Plaintiffs' complaints and that Plaintiffs had hired legal counsel. Both Defendants took efforts to protect themselves and secured their own counsel. That timing gave both Defendants . . . until February 2015 to take steps to inspect or preserve the evidence themselves and did not. As such, this passive response will not be rewarded with a dismissal from the case.
>
> As to notice of specific claims, the Defendants are in slightly different positions. Diversified was on

broader notice of [Plaintiffs'] claims based [on] the involvement of their counsel and the on-going letters from [the Plaintiffs' attorney]. Diversified knew just as well as Plaintiffs on July 1, 2014, that the project was not complete and <u>something</u> would have to be done. [The] later letters were even more specific and continued through October 1, 2014. This was sufficient notice in all ways to allow Diversified to protect itself. . . . On that basis, Diversified's Motion for Spoliation Sanctions is denied for any of Plaintiffs' claims reasonably related to the letters and communications from [the Kofords' attorney] prior to the deconstruction in February 2015.

As to Landform Design, the letters through July 1 gave it general notice of [Plaintiffs'] complaints and ample time to protect itself. As such, dismissal of Landform Design from this case i[s] unwarranted and that request is denied. What the Court is unclear of, however, is whether communications between counsel prior to February 2015, gave Landform Design the same kind of notice akin to the specifics provided to Diversified. Because the parties dispute whether Landform Design received copies of the letters later sent to Diversified[,] the Court is unable to resolve this issue currently.

Additionally, both Defendants may have Spoliation Sanction claims against Plaintiffs for defects that were . . . discovered at the deconstruction. A request to dismiss those claims is preserved and will be addressed if reasserted.

¶51 On appeal, Landform and Diversified argue that the district court abused its discretion by finding that either party was provided with notice sufficient to protect itself, and thereby

erred in concluding that total dismissal was not warranted. Landform argues that "[g]eneral notice of claims is not sufficient notice of a legitimate need to destroy, nor does it provide a reasonable opportunity to inspect the evidence." Diversified argues that even the October 2014 letter was insufficient because that letter did not specifically identify when destruction would occur, and mentioned only that *some* of the walls would be destroyed.

¶52 We think the wisest course of action under these circumstances is to vacate the district court's order and remand in light of the standards we have articulated above.[18] It is clear enough that the district court relied on the concept of notice in coming to its limited sanction rulings. But it is unclear whether the court determined that the Kofords discharged their duty to preserve evidence, or if it instead evaluated notice under the *Schmid* framework and simply found that heightened sanctions were inappropriate as a result of the notice provided. So, given the important distinction between these two concepts, we think remand is warranted. Further, it appears that the district court's analysis wrongly relied on general notice of potential litigation and the noncustodial parties engaging counsel as sufficient to discharge a duty to preserve evidence and impose the burden on noncustodial parties to proactively attempt to preserve evidence.[19] And "in an effort to offer guidance that might be

---

18. Again, we praise the district court's effort in dealing with the issues presented without any guiding Utah jurisprudence. Indeed, insofar as the issue of pre-destruction notice is considered, there is little guiding jurisprudence anywhere. And neither of the relevant cases we identified, *Golke* and *Miller*, *see supra* ¶¶ 23–32, discuss in specific terms how a court should evaluate whether there existed reasonable grounds to destroy evidence.

19. To be abundantly clear, we reject the notion that notice of potential litigation and engagement of counsel shift a burden to

(continued…)

useful on remand," we take this moment to describe the analytical steps the court should undertake in this particular case. *See State v. Valdez*, 2021 UT App 13, ¶ 54, 482 P.3d 861, *cert. granted*, (Utah June 10, 2021) (No. 20210175).

¶53　In the discharge-of-duty inquiry, the court must evaluate whether the Kofords even had reasonable grounds to destroy the evidence at issue. At times, the district court appeared to imply that the Kofords had reasonable grounds to remove the walls, but there is no specific finding on this point. Discharge is conditional on the court making a specific factual finding that the Kofords had reasonable grounds to destroy the walls. With that being said, on the record before us, the Kofords did not provide sufficient notice so as to discharge their duty to preserve with respect to either Landform or Diversified. If Landform received only the letters in June and July, then it was apprised—at most—of the potential for litigation and the factual and legal bases for it. This stops well short of what we have described is required for the Kofords to discharge their duty to preserve. But even if Landform, like Diversified, received the August and October letters, neither party was apprised of the extent to which the evidence would be destroyed, the approximate date when it would be destroyed, or that they had the opportunity to inspect the evidence.

¶54　But it is still within the district court's discretion to consider imperfect notice as a relevant consideration under the *Schmid* framework. In evaluating the Kofords' culpability, the district court may clearly consider the lengths to which the Kofords went to notify Landform and Diversified of the need to

---

(…continued)

noncustodial parties to seek to preserve evidence. These facts *might* be relevant if they were coupled with notice that evidence needed to be altered or destroyed. The primary duty to preserve rests with the custodial party and that duty persists for the duration of the litigation unless discharged.

destroy the walls and investigate the cause of their failure. Likewise, the district court may find that either Landform's or Diversified's failure to take steps to preserve or investigate the evidence was unreasonable in light of the information provided by the Kofords or other relevant facts in the record—and if the court so finds, refusing to impose severe sanctions such as outright dismissal of the case seems to be an eminently sensible judgment call.

¶55 Although we are vacating the court's order so that it can adjudicate these issues with the guidance we have set forth, nothing we have said impacts the district court's broad discretion in determining what sanction may be warranted if a breach of the duty to preserve evidence is found. And we agree with the district court's comments at the end of the motion hearing that making such calls on an undeveloped record is fraught with difficulties and may often result in a court holding a definitive ruling in abeyance until an accurate picture of prejudice is available. *See Durham v. County of Maui*, No. CIV 08-00342 JMS/LEK, 2010 WL 3528991, at *7–8 (D. Haw. Sept. 10, 2010) (noting that it was "unclear precisely what prejudice" the noncustodial party would suffer because it did not "articulate[] any prejudice beyond" generalized concerns, so the court would wait to make "a final determination of prejudice" until the existing evidence was "presented to the jury"). The parties should accordingly be circumspect in ensuring that the record is sufficiently developed before bringing these issues before the district court anew.

CONCLUSION

¶56 The district court correctly noted that Utah law on spoliation was undeveloped. We have endeavored to clarify and outline the analysis courts should employ in confronting claims of spoliation. Because the district court did not have the benefit of this guidance, because it is unclear whether the district court concluded that the duty to preserve evidence had been

discharged or whether it was evaluating the sufficiency of the notice in the context of determining the appropriate sanction, and because it appears the district court placed too much weight on general notice of potential litigation, we hereby vacate the order to afford the district court the opportunity to evaluate these issues under the standards we have clarified herein.

¶57    Vacated and remanded.

————————